## THE WILLFARO.*

### THE WILLSOLO.

### WILBUR et al. v. WILLIAMS S. S. CO.

(District Court, N. D. California, S. D. May 23, 1925.)

Nos. 17796, 17931.

1. **Shipping ⊛123—Owners of ships must use due care to ascertain nature of goods offered for shipment and exercise due care in their handling.**

Owners of ships have duty to use due care to ascertain and consider nature and characteristics of goods offered for shipment, and to exercise due care in their handling, including adoption of proper methods.

2. **Shipping ⊛123—Fish meal stowed in lower hold without ventilation held not stowed with caution and according to general usage.**

In action to recover damages for fish meal, which had become heated during shipment, evidence *held* to show that stowage in lower hold without sufficient ventilation was not in accordance with general usage.

3. **Shipping ⊛123, 138—Shipowner held liable for damages to fish meal, which was negligently stowed in lower hold without sufficient ventilation.**

Owner of ship *held* negligent in stowing fish meal in solid blocks in lower hold without ventilation, and, under the Harter Act (Comp. St. §§ 8029–8035), liable for damages.

4. **Shipping ⊛138—Shipowner is not protected under fire statute from fire caused by negligent stowing of cargo.**

Where executive officer of ship company acquiesced in stowing fish meal in large blocks in lower hold, with insufficient ventilation, shipowner would not be entitled to protection of fire statute (Rev. St. § 4282 [Comp. St. § 8020]), where fire, if there was any, was result of spontaneous combustion.

In Admiralty. Consolidated actions by the Pacific Guano & Fertilizer Company against the steamer Willfaro, the Williams Steamship Company, claimant, and by the Wilbur-Ellis Company against the steamer Willsolo, the Williams Steamship Company claimant. Decrees for libelants.

Derby & Single and Carroll Single, all of San Francisco, Cal., for libelant Pacific Guano & Fertilizer Co.

Sawyer & Cluff and Daniel W. Evans, all of San Francisco, Cal., for libelant Wilbur-Ellis Co.

*Decree affirmed 9 F.(2d) 622.

Thacher & Wright and Thomas A. Thacher, all of San Francisco, Cal., for claimant.

KERRIGAN, District Judge. These two cases, being alike in their facts, were consolidated for trial. They are actions for damages, and involve two shipments of fish meal from Baltimore, Md., to Los Angeles, Cal., and to Portland, Or., respectively. The Pacific Guano & Fertilizer Company shipment was of 7,009 bags of fish scrap or fish meal. It was taken aboard the steamer Willfaro, operated by the claimant, the Williams Steamship Company, and 3,116 bags of the fish meal were stowed in the No. 4 lower hold. When the vessel arrived at Los Angeles, on October 23, 1922, it was found that the meal in the lower part of the hold had become heated. The remaining 3,893 bags were stowed in four other places in the vessel in smaller quantities, and they suffered no damage.

In the other case the shipment was of 1,000 bags of fish meal in the steamship Willsolo, also operated by the Williams Steamship Company. This lot was stowed in No. 5 lower hold. Upon arrival in San Francisco, on the way to Portland, on October 17, 1922, it was discovered that this fish meal also had become heated, and its market value seriously impaired.

The contention of the claimant in these cases is that the damage complained of resulted from the inherent vice of the meal. The theory of the libelant, on the other hand, is that the owners of the vessels violated the contracts of carriage by negligently and improperly stowing the cargo, which by reason thereof became heated, thereby devitalizing the fish meal and rendering it unmerchantable.

Fish meal, or fish scrap, is fish boiled, with the oil and the moisture almost entirely extracted; then it is dried and ground up. Aside from some moisture and oil, it contains nitrogen. It is used as chicken feed and as a fertilizer. There is no difference between fish meal and fish scrap, except that fish scrap is coarser than fish meal. Since it contains oil and moisture, it is freely admitted by libelants that, if fish meal is not properly stowed and ventilated, it may heat, and result in a lowering of its commercial value.

The claimant argues that the meal in these cases was stowed in the customary manner, and that the heating which developed was consequently the result of inherent vice of the commodity. Claimant's witnesses in effect testified that the meal in each instance was stowed as the claimant and other shippers, so far as they knew, had stowed scrap

meal for years, and as these were the only shipments they ever heard of as heating, they could only ascribe the occurrence to the inferior quality of the meal. According to their experiences and observation there was no occasion for stowing fish meal differently from all other bagged material, such as flour, oyster shells, sugar, etc. They had never given the stowage of fish meal any special attention, and, as just stated, they have never before known of such a product heating.

Evidence introduced by the libelants shows that the meal was received in good order and condition; that, since commercial fish meal contains some oil and moisture, if packed close together in bags, in large quantities, and not well aired, heating and consequent damage will result; that in both of these cases the meal was stowed in solid blocks in the lower holds of the two vessels, where the ventilation in all ships is the poorest. According to the testimony of one of the experts introduced by libelants, fish meal should never be stowed in quantities exceeding 100 tons, even in a warehouse, where the ventilation, as compared with a ship's hold, is vastly superior. Another witness said: "We never have any trouble from heating, * * * where the meal is properly stowed in a vessel or on a car, and ventilation provided. The oil and water content do not seem to bother, if suitable ventilation is provided." He further said: "It cannot be packed too tightly, and it cannot be packed in an entirely closed space. When I say 'cannot,' I mean you are running a risk that material might tend to heat."

A marine surveyor, regarding the stowage of the 3,116 bags on the Willfaro, said: "It was a solid block of sacks, * * * straight down under the hatch, with no dunnage in between the sacks, and no air shafts or any other means of ventilation, such as is customary in a shipment of this nature. * * * There was no dunnage or wood of any description whatsoever in the shipment to rest the weight, or allow the air or anything like that to percolate through. * * * There was no ventilation whatsoever from the sides of the ship."

A sea captain of long experience testified in part: "The lower portion only became heated." Stowed in a great pile, as this was, "the weight would have a tendency to weld it together; * * * it being of an oily nature, and containing various phosphates, and being in a moist condition from the nature of being moist and soft in sacks, it would weld together of its own weight and be liable to

spontaneous combustion by self-generated heat."

Capt. Cecil Brown testified that to store fish meal as stowed here was to invite danger. Claimant took the deposition of a stevedore who worked in unloading the Willfaro. He deposed to the effect that it was "absolutely stowed en bloc, the same as you would stow sugar or flour, * * * right up to the hatch coamings 'tween decks. * * * It completely filled the square of the hatch. * * * There was no dunnage. * * * There was no ventilation at all. She went right solid down." He also stated that there was nothing to protect this portion of the cargo from the heat of the shaft alley, which was appreciable.

Another of claimant's expert witnesses testified that a cargo which is apt to heat usually is stowed in well-ventilated places, and that extra precautions are taken to keep it well ventilated; in the case of rice cargo, which notoriously heats, and damp pepper, inexpensive wooden box ventilators are stowed along with the cargo; and that a cargo which from its nature requires special ventilation should not be loaded in the lower hold, boxed in on all sides by cargo and 11 feet deep, with no shaft or alley between the sacks.

What little may be found on the subject in books supports the view of libelants. On page 40 of Harris' Technological Dictionary of Insurance Chemistry appears the following note on "spontaneous combustion": "If we would guard against trouble from dangerous substances, we must prevent keeping them in close places. We must ventilate. Ventilate thoroughly. We must 'divide and conquer.'" The United States government publication, "Stowage of Ship Cargoes," issued by the Bureau of Foreign and Domestic Commerce of the Department of Commerce, on page 78 says that, "in a vessel with several decks, the between-decks are better ventilated and therefor are ordinarily cooler than the hold."

Referring to the meal shipped on the Willsolo, it is significant, as is said in one of the briefs, that it was only that portion of the meal which was least ventilated and under the most weight that became heated. Fish meal of the same lot in other portions of the Willsolo was unaffected. The method of stowage was less suitable in the case of The Willsolo than in the case of The Willfaro, for, in addition to placing the material in a block in a lower hold of the ship, oyster shells were stowed beneath it, with a solid

block of oyster shells fore and aft, and a cargo of furniture on top of it.

[1, 2] The law imposes upon owners of ships the duty of using due care to ascertain and consider the nature and characteristics of goods offered for shipment, and to exercise due care in their handling, including the adoption of such methods as their nature require. Southern Pacific Co. v. Walker Smith, etc. (Tex. Civ. App.) 257 S. W. 347. The evidence in this case fails to show that there was an established, uniform, and definite custom warranting the stowing of the fish meal in the manner followed in these two cases. Unfortunately for the claimant, its officers may not have known the dangers incident to the method of stowage adopted in these cases, and, while the product here may have been stowed according to the practice and custom of claimant, it was not in essential respects stowed with caution and according to the general usage.

[3] To recapitulate, the evidence clearly shows that, while fish meal under certain conditions will heat and ignite, it may be carried with perfect safety, if properly stowed and ventilated. This claimant should have known. Due regard to the nature of the product was not had by the claimant in its stowage, and therefore in this respect the company must be held guilty of negligence, and, under the Harter Act (Comp. St. §§ 8029–8035), liable. Claimant asserts, however, that the damage to the fish meal was caused by fire, and that it is entitled to the protection of section 4282 of the Revised Statutes (Comp. St. § 8020), known as the fire statute.

[4] The evidence shows, as just seen, that the heating was caused by reason of the negligent stowing of large blocks of the product in the lower holds, where the ventilation is insufficient. This method of stowage was known and acquiesced in by the general agent of claimant at Baltimore, who for three years had been supervising the loading of cargoes for it. Hence the case is governed by that of The Virginia (D. C.) 264 F. 996, affirmed in Hindes v. Butler (C. C. A.) 278 F. 880, certiorari denied 257 U. S. 659, 42 S. Ct. 185, 66 L. Ed. 421, where it was ruled that, because executive officers of the owners of a vessel were frequently on board and therefore "must have known" of defects in the fire apparatus and laxity of drills, they were not protected by the fire statute, because, but for such negligence, the fire might have been extinguished. Here, but for negligence in which an executive officer acquiesced, the fires (admitting that there ever was one in the case of the Willfaro, of which there is great doubt) would never have occurred. It follows, therefore, under the plain provisions of the act, that claimant does not come within the purview of its protection.

Other points are made by claimant, but they are technical, and do not merit discussion. The stowage having caused the excessive heating, the claimant is liable for all the resulting damage.

Let an interlocutory decree be entered in favor of the libelants, and for the purpose of determining the amount of damages due each of the libelants the cases are referred to Commissioner Krull to take evidence, and to make findings and suggest appropriate conclusions, subject to the approval of the court.