## THE HINDANGER.
### No. 7275.

Circuit Court of Appeals, Ninth Circuit.
March 13, 1935.

Carl R. Schulz and Milton D. Sapiro, both of San Francisco, Cal., for appellants.

Lillick, Olson & Graham, Ira S. Lillick, and Chalmers G. Graham, all of San Francisco, Cal., for appellees.

Before WILBUR and GARRECHT, Circuit Judges, and NORCROSS, District Judge.

NORCROSS, District Judge.

Appellants, libelants in the court below, filed libels against the motorship Hindanger et al., respondents and appellees, to recover damages alleged to have been occasioned by delay and deviation of the said motorship Hindanger on a voyage from the ports of Seattle and San Francisco to Buenos Aires, Argentina, occasioning loss by reason of decline in the market value of 11,000 and 4,000 cases of eggs, shipped by appellants from said Pacific Coast ports respectively, on said Hindanger for delivery at the port of Buenos Aires. The libels were consolidated for trial, and the consolidated action referred to a commissioner, as special master, by stipulation of the parties and order of the court, "for hearing, determination and report." The report of the special master was by the court confirmed. From final decrees declaring respondents to be without fault in the premises and dismissing the libels, libelants have appealed.

The libels alleged that each of the shipments was accomplished under an oral contract of affreightment, which, it is charged, was breached by the appellees. Each libel declares that the motorship deviated on the voyage in question, by reason of which damages were sustained by the appellants. The question of damages, however, was not presented to the special master, and an interlocutory decree only was sought.

The appellants are co-operative associations marketing eggs of their member producers. For some months prior to the time the shipments in question moved, appellants, through their employees and their selling agent, Pacific Egg Producers, Inc., carried on negotiations looking forward to these shipments of eggs to be made to Buenos Aires. The master found that the 4,000 cases shipped by the Washington Association were placed on board the Hindanger at Seattle on or about March 28, 1930, and that the 11,000 cases shipped by the Central California Association were placed on board at San Francisco on or about April 7, 1930. The Hindanger sailed from San Francisco on or about April 10, 1930, and arrived at Buenos Aires on May 29, 1930. During the journey to Buenos Aires, the motorship called and stopped, in rotation, at the following ports: San Pedro, Cal.; Pernambuco, Bahia, Rio de Janeiro, Santos, and Montevideo.

The appellants contend that, by virtue of an alleged oral contract, entered into on March 10, 1930, the Hindanger should have sailed from San Francisco on April 4, 1930, and should have arrived at Buenos Aires within approximately thirty-five days thereafter. They also assert that an advertisement of the appellees, published in "The Guide," "showed the vessel as calling at Rio de Janeiro, Santos, Buenos Aires and Montevideo, Rosario and Santa Fe (if inducements offer)."

The master found that no oral contract had been entered into between the parties, and that the series of preliminary conferences and meetings, in which rates, sailing schedules, and the like were discussed, had resulted in no definite "meeting of minds"; that the Hindanger is a motorship devoted to the carrying of general cargo; that on the voyage in question, the calls made by the ship at the various ports were made "in geographical rotation," for the essential purpose of discharging goods consigned to such ports; that in the absence of any oral agreement the rights of the parties must necessarily be determined by the bills of lading, which endowed the vessel with liberty to call at ports in geographical rotation; that the voyage to Buenos Aires was a long one and was, under the "liberty to call" privileges, completed within a reasonable time; that no negligent delay was shown; that stopping at the various ports mentioned above was not a deviation; and that the time consumed on the voyage was not a deviation. Accordingly, the master recommended that the libels be dismissed and that appellees be awarded costs of action. The appellants duly excepted to the master's report. The report was confirmed by the court below, which made findings of fact and conclusions of law. The appellants likewise excepted to the court's findings and conclusions.

The determination of this appeal depends upon two questions:

1. Was there, as contended by appellants, an oral contract of affreightment between the parties?

2. If not, and the bills of lading are taken to constitute the contract between the parties, is the "liberty of call" clause in such bills of lading, relied upon by the appellees, valid and enforceable?

The testimony as to the existence of an oral contract of affreightment was conflicting. John Lawler, general manager of the Poultry Producers of Central California, one of the appellants herein, testified that he "confirmed" a "contract" or "arrangement" with Westfal-Larsen & Co., one of the appellees, made through the General Steamship Corporation with Walter Van Bokkelen, whose "firm was to sell the eggs in the Argentine." J. E. Rother, sales manager of the Poultry Producers, declared that he himself did not have any kind of agreement with the appellees on behalf of his association, but that a Mr. Benjamin, general manager of the Pacific Egg Producers, which "handled the export business for these Pacific Coast Associations," carried on the "principal negotiations and conversations." Mr. Benjamin was not produced as a witness by either side. R. S. Wintemute, vice president in charge of traffic of the General Steamship Corporation, which was the agent of Westfal-Larsen & Co., testified that a contract was made with Van Bokkelen. The appellants, in their brief, concede that Van Bokkelen did not own the eggs and was not purchasing or shipping them. On the other hand, the record conclusively establishes that appellants were both the owners and the shippers of the eggs in question.

From the foregoing, it will be seen that the testimony tending to establish an oral contract of affreightment between the appellants and the appellees was extremely vague. In any event, such testimony was contradicted by Wintemute's positive statement that the "conversations" which he had with Benjamin—who Rother testified carried on the "principal negotiations and conversations"—did not lead to any contract between the parties hereto. The specific record on this point is as follows:

"Mr. Graham: Q. Mr. Wintemute, did any of these conversations which you had with Mr. Benjamin result in the booking of any cargo by you for the Pacific Egg Producers for shipment on your vessel at that time, and particularly the 'Hindanger'? A. No."

The proposition that, on a consent reference, a finding by a commissioner or special master, approved by the court, if based upon conflicting testimony given in open court, will not be disturbed except for serious or obvious error, is too well established to require extended citation of authorities. Two recent decisions of this court, opinions by the late Judge Sawtelle, contain exhaustive discussions of this rule: Southern Pacific Co. v. Western Pacific Co., 61 F.(2d) 732, 733, 734, and The Tourist No. 2, 64 F.(2d) 669, 670, 671. Accordingly, since we find no "manifest error in the consideration given to the evidence, or in the application of the law," the master's finding that there was no oral contract of affreightment between the parties should be accepted as conclusive.

Having found that there was no oral contract of affreightment, resort must be had to the bills of lading for the measure of the rights of the parties in connection with the shipments in question. Clause 2 of the bills of lading in question reads as follows: "The vessel to have liberty, either before or after proceeding towards the port of discharge; to proceed to the said port via any port or ports in any order or rotation outwards or forward, whether in or out of, or in a contrary direction to, or beyond the customary or advertised route; to pass the said port for which the cargo is destined and to return thereto; without the same being deemed a deviation, whatever may be the reason for calling at or entering said port or ports, or for making such voyage or voyages, whether for the purpose of this, a prior, or subsequent voyage; to altogether depart from the customary route; to make in substance another and different voyage; to change or completely abandon the original voyage; to transship or land and reship the goods at ports of shipment and transshipment, or at any other ports, or into any other steamer or steamers or sailing vessel for any purpose, and to forward to destination by another vessel; also to tow and assist vessels in all situations and to sail with or without pilots; all the said liberties, exceptions and conditions shall apply, although the vessel may be deviating from the voyage, and although such deviation may amount to a change or abandonment of the voyage; all such deviations are to be deemed within the contract voyage and

notwithstanding unseaworthiness or unfitness of the ship at the commencement or during any period of the voyage."

Clause 23 provides: "Nothing herein contained shall prevent the shipowners from claiming the benefits of the United States Revised Statutes, sections 4281 to 4287, and the rules from time to time made thereunder and of the provisions of the Act of Congress of the United States approved on the 13th day of February, 1893, entitled 'An act relating to Navigation of Vessels, &c.' Provided that in all cases where merchandise or property is transported under this contract from or between ports of the United States and foreign ports within the meaning of the said Act of Congress of 1893, and proceedings are taken against the company or vessel carrying the goods, then the provisions of the said Act of Congress and Revised Statutes shall be held to apply to this contract, and the shipments shall be subject to all the terms and provisions of and all exemptions from liability contained in the said Act of Congress and Revised Statutes; and any provisions of this Bill of Lading inconsistent with the said Act of Congress and Revised Statutes shall be treated as struck out and expunged."

The appellants contend that the "liberty of call" clause in the bill of lading is "clearly inconsistent" with sections 1 and 2 of the Harter Act (46 USCA §§ 190 and 191), which provides as follows:

"1. It shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect.

"2. It shall not be lawful for any vessel transporting merchandise or property from or between ports of the United States of America and foreign ports, her owner, master, agent, or manager, to insert in any bill of lading or shipping document any covenant or agreement whereby the obligations of the owner or owners of said vessel to exercise due diligence [to] properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage, or whereby the obligations of the master, officers, agents, or servants to carefully handle and stow her cargo and to care for and properly deliver same, shall in any wise be lessened, weakened, or avoided."

To the extent that is relied upon by the appellees herein, the "liberty of call" clause transcribed above has been repeatedly upheld by the courts.

In the case of W. R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha (D. C.) 7 F.(2d) 889, 891, 892, the court said:

"As a conclusion from all the cases, it is apparent that the 'general liberty' clause is not treated as of 'no effect.' It is a stipulation of the parties, to be given effect, like other stipulations, in so far as it does not conflict with the Harter Act, * * * or the general purpose and policy of the law, or the real intent of the contract between shipper and carrier. It may be fairly said that reservations by a carrier of general liberties of departure from the route of the contractual voyage must be read in due relation and subordination to the main commercial purpose of the contract of affreightment, and as a matter of law will justify only such deviations from that route as are consistent with that particular commercial purpose.

"The propriety of any particular deviation is a question of fact in each case and there is no fixed rule for such determination. It is a question of inherent reasonableness, and pertinent to the inquiry of the surrounding circumstances, namely, the commercial adventure, which is the subject of the contract, the character of the vessel, the usual and customary route, the natural and usual ports of call, the location of the port to which the deviation was made, and the purpose of the call thereat."

The foregoing case was affirmed by this court, 12 F.(2d) 519.

In Dietrich v. United States Shipping Board, etc. (C. C. A. 2) 9 F.(2d) 733, 741, 742, certiorari denied, 278 U. S. 647, 49 S. Ct. 82, 73 L. Ed. 560, the bills of lading provided, much as in the instant case, that "the vessel with the goods on board, either before or after proceeding toward the port of discharge, may remain in port, proceed by any route, and deviate from or change the advertised and intended route at any

stage of the voyage, and may proceed to and stay at any places whatsoever, although in a contrary direction to, or outside of, or beyond the usual route to the said port of discharge once or oftener, in any order, backwards or forwards. * * *"

With such a contract of affreightment before it, the court said:

"In the absence of some agreement to the contrary, a voyage must be commenced without needless delay, and must be prosecuted without unnecessary delay or deviation. The shipowner's agreement is that he will be diligent in transporting the goods to their destination, and that he will do so without unnecessary deviation. And there can be no doubt that, if the cargo which was to be carried to Finland by the Panola had not been received under such a contract as is disclosed in this record, and which gives a wide liberty to do things which otherwise would be deviations from the voyage, a liability on the part of the shipowner for such delays as occurred in this case could not be successfully controverted. It seem[s] to us equally plain that, under the bills of lading issued and accepted without protest in this case and the wide liberty contracted for, the shipowner is not liable for the delay which occurred in the transportation of the cargo herein involved, assuming the agreement is valid. * * *

"But no case has been called to our attention which holds that such a provision as that found in the bills of lading herein involved is void, and we are not prepared to hold it to be void. While the provision in question cannot be construed to be void, or as intended to confer upon the shipowner an absolute and unrestricted liberty to delay for any length of time, and for any reason, or no reason, the transportation of the goods, still the intention of the parties must be so restricted and limited as to apply only to delays fairly ancillary to the prescribed voyage. In effect, the promise of the shipowner was to carry the goods to their destination as soon as the reasonable arrangements of the carrier respecting the voyage would allow."

See, also, The Emilia S. de Perez (Nilsen, Rantoul & Co. v. Ocean Transp. Corp.), 287 F. 361 (D. C.) affirmed (C. C. A.) 288 F. 1019; United States Shipping Board, etc., v. Pensacola Lumber & Timber Co. (C. C. A. 5) 290 F. 358; The Frederick Luckenbach (D. C.) 15 F.(2d) 241, 243, 244; United States Shipping Board, etc.,

v. Florida G. & E. Co. (C. C. A. 5) 20 F.(2d) 583, 585; The Eastern Tempest (D. C.) 24 F.(2d) 586.

When it is considered that, in the words of appellants' own libels, the Hindanger is a "general ship," it cannot be said that its various port calls complained of "conflicted with the Harter Act [46 USCA § 190 et seq.]," or the "general purpose and policy of the law, or the real intent of the contract between shipper and carrier." Nor can it be contended that such calls violated the canons of "inherent reasonableness," in view of "the wide liberty contracted for," "the commercial adventure, which is the subject of the contract, the character of the vessel, the usual and customary route, the natural and usual ports of call, the location of the ports to which the deviation was made and the purpose of the calls thereat."

Decrees affirmed.