## THE NICHIYO MARU.

## THE TOHSEI MARU.

### WELLMAN v. TOYO KISEN KABUSHIKI KAISHA et al.

Nos. 2017, 2018, 2020.

District Court, D. Maryland.

April 25, 1936.

George W. P. Whip, of Baltimore, Md. (Lord & Whip, of Baltimore, Md.), for libelant.

George Forbes and Henry Wortche, both of Baltimore, Md., for respondents.

728

CHESNUT, District Judge.

These three admiralty cases involve very similar questions of law and fact, and, at the request of counsel for all the parties, have been tried together. In each case claim is made for damages to cargo shipments of fish meal from ports in Japan to Baltimore due to heating of the meal during the voyage. In each case the damaged meal was stowed in one of the lower holds of the ships, while similar shipments on the same ships carried in the upper or between-decks holds, arrived at destination without material damage. The basis of the libelant's claim is that the ships in each of the three cases were guilty of negligence in the manner of stowage and failure to provide sufficient ventilation to the cargo. Liability by reason of deviation in the voyage has also been suggested but has not been seriously pressed.

The libelant in each case is William E. Wellman, who was the importer of the fish meal but the suits are brought for the substantial benefit of the Standard Wholesale Phosphate and Acid Works, Inc. (hereinafter sometimes called "Standard") a Maryland corporation, with plant at Baltimore, Maryland, which became the purchaser of the goods from Wellman. While Wellman made the original contract with the Japanese vendors and shippers, he was acting really substantially as broker. In the case of each shipment Wellman made a contract of purchase with Y. Sagawa & Co., of Japan, who shipped the goods by the three respective Japanese steamers consigned to the Chase National Bank of New York, but for delivery at the wharf of the "Standard" in Baltimore. The Japanese shipper received payment in Japan upon delivery of the goods to the ships and the issuance of the bills of lading. Wellman secured the credit for the payment through the National Marine Bank of Baltimore on the basis of the guaranty by the Standard Company. Upon the arrival of the goods in Baltimore the Standard Company paid Wellman at the wholesale price agreed upon before the delivery. The Standard Company has made claim on Wellman for the damage and the suits are for the substantial benefit, therefore, of the Standard Company. All of the bills of lading were issued by the Kawasaki Kisen Kaisha, known as the "K" Line, which operated each of the three steamers carrying the fish meal. One vessel, the Soyo Maru, arrived at Baltimore after a voyage of about sixty days from Japan, on June 1, 1934; the second steamer, the Nichiyo Maru, arrived on June 12, 1934, and the third steamer, the Tohsei Maru, arrived on June 13, 1934. The voyage of the latter steamers was of somewhat less duration, about forty days. The voyage from Japan was by way of the Panama Canal with calls at Los Angeles and Cristobal, and then the steamers proceeded to New York (and in one case to Boston) thence to Philadelphia and Baltimore. Cargo was unloaded at each of the Atlantic seaboard ports.

Among the conditions of each of the bills of lading were the following:

"The carrier may substitute, or tranship by any other or succeeding steamer, and the steamer with the goods on board, either before or after proceeding toward the port of discharge, may proceed to and stay at any ports or places whatever, although in a contrary direction or to outside of or beyond the usual route to the said port of discharge, once or oftener in any order, backwards or forwards, for loading, or discharging cargo, coal or passengers, or for any purpose whatever, and all such ports, places or sailings shall be deemed included within the intended voyage. This liberty is not to be considered as restricted by any words of this contract, whether written, stamped or printed. The vessel may adjust compasses, and dock and go on ways with or without cargo on board after commencing the voyage."

Condition 3 of the bills of lading stipulated among other things, as follows:

"The carrier shall not be liable for loss or damage occasioned by, or due to or arising from causes beyond the carrier's control, * * * by water, *heat, heating,* frost, decay, mould, evaporation, smell, taint or damages from or contacts with any goods, putrefaction, rust, *sweat,* rain or spray; the nature of the goods, change of character, drainage, leakage, breakage, vermin, rats, coal dust, by explosion of any goods, whether shipped with or without disclosure of their nature;" etc.

As to the liability based on alleged deviation little need be said. The libelant's contention is that the steamers respectively should have made delivery at Baltimore before proceeding to New York, Boston and Philadelphia. This is based on the contention that Baltimore should be considered to have been on the direct route of the journey and that the ship unwarrantably passed Baltimore to go to New York. It appears, however, that the order of the ports of call

of the voyage were fully advertised in Japan before the steamers sailed; and I am not prepared to hold that the call at New York prior to proceeding to Baltimore (which would have involved the voyage up the Chesapeake Bay for some 200 miles from the Capes and the return of the steamer by that route to New York) necessarily amounted to a deviation under the circumstances. But however that may be, it seems entirely clear under the adjudicated cases that the condition of the bills of lading with regard to deviation sufficiently protects the ships in this case. See Dietrich v. United States Shipping Board Emergency Fleet Corporation (C.C.A.2) 9 F.(2d) 733, 740, 742, where the authorities are reviewed at length by Circuit Judge Rogers. See, also, Smith v. United States Shipping Board Emergency Fleet Corporation, 26 F.(2d) 337 (C.C.A.2); The Hindanger, 76 F.(2d) 13 (C.C.A.9); The Emelia S. de Perez (D. C.) 287 F. 361, affirmed 288 F. 1019 (C.C. A.2).

The more difficult question in the case arises from the other claimed basis of liability, that is, negligence in stowage and insufficiency of ventilation. The damage to the fish meal was occasioned by "heat, heating, * * * (and) sweat," which, as will be seen, was an excepted cause of loss in the bill of lading. However, it is not disputed by counsel for the respondents that this provision of the bill of lading does not exempt them from liability if they were negligent as alleged. The Schnell v. Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L. Ed. 373.

Whether the respondents were negligent with respect to the method of stowage and insufficient provision for ventilation is, therefore, the dominant question of fact in the case. The testimony bearing upon this question is quite voluminous consisting of lengthy depositions and oral testimony in court for six full days. The questions have been fully argued by counsel and I have given the matter careful consideration. With regard to the fixed ventilation of the ships, that is to say, the size and number of ventilators from the weather deck to the holds, I find no insufficiency of the ships in that respect, at least for general cargo. Each of the three ships was built according to standard and approved practice and in addition thereto the preponderance of the evidence as a result of inspection by the respondents' surveyors, satisfies me on the point. Two of the ships were only a few

years old and one was on her first voyage. All were the ordinary type of cargo vessels. The Soyo Maru was 415 feet long by 56 wide, with gross tonnage of six thousand. The others were about the same size. It is true, however, that fish meal is by its nature a commodity which requires provision for more ventilation than general cargo. It is an oily substance which by its very nature tends to spontaneous combustion, and requires ample ventilation, especially when a long voyage is in contemplation. This characteristic is generally well known to shippers and shipowners. In Bank Line, Limited, v. Porter (C.C.A.4) 25 F.(2d) 843, 845, 1928 A.M.C. 761, the Circuit Court of Appeals said:

" 'The law imposes upon owners of ships the duty of using due care to ascertain and consider the nature and characteristics of goods offered for shipment, and to exercise due care in their handling, including * * * such methods as their nature require. Southern Pac. Co. v. Walker-Smith Co. (Tex.Civ.App.) 257 S.W. 347; Willfaro-Willsolo (D.C.) 9 F.(2d) 940 [1925 A.M.C. 998], affirmed [Williams S. S. Co. v. Wilbur] (C.C.A.) 9 F.(2d) 622 [1926 A.M.C. 32]; Arkell & Douglas v. United States (C.C.A.) 13 F.(2d) 555 [1926 A.M. C. 1123]; Herman et al. v. Compagnie Generale Transatlantique (C.C.A.) 242 F. 859. The dangers arising in the transportation of combustible material are greatly enhanced by the prolongation of the voyage. * * *' The Elizabeth Dantzler (D.C.) 263 F. 596."

In The Willfaro (Pacific Guano & Fertilizer Co. v. Steamer Willfaro), 9 F.(2d) 940 (D.C.N.D.Cal.), (cited with approval in Bank Line, Limited, v. Porter, supra), affirmed Williams S. S. Co. v. Wilbur (C.C. A.) 9 F.(2d) 622, a steamship was held liable under the particular facts for a cargo of fish meal damaged by heating on the voyage caused by insufficient provision for ventilation and improper stowage. Much that was said in The Willfaro is applicable here to the case of the Soyo Maru. I quote some of the more pertinent extracts from the opinion of the District Judge in that case:

"The contention of the claimant in these cases is that the damage complained of resulted from the inherent vice of the meal. The theory of the libelant, on the other hand, is that the owners of the vessels violated the contracts of carriage by negligently and improperly stowing the cargo,

which by reason thereof became heated, thereby devitalizing the fish meal and rendering it unmerchantable.

"Fish meal, or fish scrap, is fish boiled, with the oil and the moisture almost entirely extracted; then it is dried and ground up. Aside from some moisture and oil, it contains nitrogen. It is used as chicken feed and as a fertilizer. There is no difference between fish meal and fish scrap, except that fish scrap is coarser than fish meal. Since it contains oil and moisture, it is freely admitted by libelants that, if fish meal is not properly stowed and ventilated, it may heat, and result in a lowering of its commercial value. * * *

"Evidence introduced by the libelants shows that the meal was received in good order and condition; that, since commercial fish meal contains some oil and moisture, if packed close together in bags, in large quantities, and not well aired, heating and consequent damage will result; that in both of these cases the meal was stowed in solid blocks in the lower holds of the two vessels, where the ventilation in all ships is the poorest. * * *

"Another of claimant's expert witnesses testified that a cargo which is apt to heat usually is stowed in well-ventilated places, and that extra precautions are taken to keep it well ventilated; in the case of rice cargo, which notoriously heats, and damp pepper, inexpensive wooden box ventilators are stowed along with the cargo; and that a cargo which from its nature requires special ventilation should not be loaded in the lower hold, boxed in on all sides by cargo and 11 feet deep, with no shaft or alley between the sacks."

In that case (where the voyage was from Baltimore to Los Angeles) there was testimony on behalf of the ship to the effect that the meal was stowed in the customary manner and that according to the experience and observation of the shipowners there was no occasion for stowing fish meal differently from other bagged material and that they had never given the stowage of fish meal any special attention because they had never before known of the product heating. As to the effect of this evidence the court, after observing that the law imposed the duty of using due care to ascertain the nature of the cargo carried and to exercise due care in its handling, said:

"The evidence in this case fails to show that there was an established, uniform, and definite custom warranting the stowing of the fish meal in the manner followed in these two cases. Unfortunately for the claimant, its officers may not have known the dangers incident to the method of stowage adopted in these cases, and, while the product here may have been stowed according to the practice and custom of claimant, it was not in essential respects stowed with caution and according to the general usage.

"To recapitulate, the evidence clearly shows that, while fish meal under certain conditions will heat and ignite, it may be carried with perfect safety, if properly stowed and ventilated. This claimant should have known."

Much of what was said as to the facts in the case of the Willfaro is duplicated by the testimony in this case with respect to the Soyo Maru. Here the Captain admitted that he knew that fish meal required more than the usual amount of ventilation and that where practicable, in view of other cargo, it is better to stow it between decks rather than in the lower hold; but in the particular case the larger portion (about 90 per cent.) of the fish meal was stowed in the lower holds because of insufficiency of space between decks, which was used for other cargo. Similar knowledge was elicited on cross-examination of an officer of the Tohsei. Counsel for the respondents points to certain differences in the facts between the stowage in the Willfaro and the Soyo Maru, but on the whole testimony I consider the differences comparatively slight. In neither case were "rice ventilators" used to afford some greater ventilation than from the ships' permanent ventilators. In the cases of the Nichiyo and the Tohsei, rice ventilators were used, but the damage was proportionately equally great. In all three cases the *total mass* of the fish meal in the lower holds was entirely too large for the ventilation afforded, in view of the long voyage.

What occurs in the heating of fish meal stowed under different conditions is a problem in organic chemistry, as to which there is still no very exact scientific knowledge. What is commonly understood in the trade is that fish meal requires ample ventilation. It is said that a bag of fish meal in good condition placed in the open air will keep without deterioration practically indefinitely. On the other hand, large quantities of fish meal closely packed and insufficiently ventilated, will heat and deteriorate. And if these conditions persist long

enough the substance may even be actually fired from spontaneous combustion. Between these two extremes of known safety and certain danger, lies the somewhat uncertain field through which the line must be drawn to establish the conditions as to reasonable care in the stowage of fish meal for a long voyage, under conditions that are practicable. Clearly the testimony in this case shows that it is safer to stow fish meal between decks than in the lower holds. All the fish meal in these three shipments stowed between decks carried safely from Japan to Baltimore, and the evidence instanced numerous other shipments of fish meal from Japan to Baltimore about the same time which, when carried in the between decks compartment of the ships, was discharged in good condition; as well as instances where fish meal carried in the lower hold of a ship was discharged in bad condition. On the other hand, however, some instances were cited where fish meal had apparently carried safely in a lower hold, and sustained some damage when carried between decks. In passing it may be noted that in the Willfaro Case, one of the experts testified that fish meal should never be stowed in quantities exceeding 100 tons (2,000 bags) even in a warehouse where ventilation is better than in a ship's hold. In this case much larger quantities were stowed in the holds of each ship.

Just why there should be greater danger in carrying fish meal in the lower hold than between decks is not certainly shown in the testimony other than the better ventilation. The libelants contend that it is merely a matter of adequate ventilation. But, this would seem not to be the whole explanation. The more scientific theory would seem to be that advanced by Prof. Simmons, for many years Professor of Chemistry at New York University, who recently conducted experiments to determine if possible just what happens in the deterioration of fish meal and what are the dangers incident to its transportation. He advances the view that it is the absorption of excess moisture rather than absence of ventilation which starts the damage. It seems to be his view that it is the presence of excess quantities of oil and moisture in the fish meal that start the dangerous deterioration which, however, may become exaggerated or accelerated by the too close stowage. He points out that the conditions of air-humidity in a sea voyage and the lower temperatures of the lower hold in comparison to those of the upper between-decks stowage compartments of the ship, tend to increase the moisture absorption of fish meal which is a hygroscopic or deliquescent substance. It would appear that the so-called heating of fish meal is at least not directly caused by excess temperatures. Much of the damaged fish meal in these cases was stowed in No. 1 lower hold of the ships which is said to be the coolest hold in the whole ship. The evidence is to the effect that the between-decks hold is by virtue of its exposure to the sun usually warmer than the lower holds, although there is some dispute as to this. The height of the lower holds is greater than that between decks and the tiers of the fish meal bags stowed one upon another were higher in the lower hold than the between-decks. It is however not the pressure of weight which causes the damage because many of the lowest bags in the tiers of the lower hold were undamaged. The greatest damage in these shipments seemed to be localized in the bags within what is called the "square of the hatch." The damaged bags were, however, as a whole found irregularly dispersed throughout the lower hold. An undamaged bag would be found in immediate proximity to one or more damaged bags. This of course tends strongly to indicate that different lots of fish meal react differently although subjected to the same conditions. The probable explanation is that the fish meal is not of uniform quality, some containing when shipped much more oil and moisture than others.

The evidence as a whole indicates that the process of deterioration is begun when the substance contains an excess quantity of moisture, and if the vapor resulting from oxidation is not allowed to freely escape in the air, heating results with consequent damage. The total mass of the meal in relation to the available air space is obviously a very important factor. In other words, ample and adequate ventilation is essential to prevent harmful heating. The available ventilation between decks is much greater proportionately to the mass of meal therein stowed than in the lower hold if both are filled with cargo, as was the case here. This is the probable explanation why the meal carried safely in the former, but spoiled in the latter.

Some idea of the mass of the fish meal in the lower holds of the ships can be obtained by examining the stowage plan of the Soyo Maru (Respondents' Exhibit No. 1). In lower hold No. 1, there were three sepa-

rate lots of fish meal, one of 5,600 bags, another of 1,120 bags and the third of 3,733 bags. These were stowed one on top of the other, in all 10,453 bags, which occupied more than half of the hold, the rest of the space being filled with other cargo. Each bag contained 100 pounds of fish meal. The hold was twenty-five feet deep and the bags were piled from the bottom to a foot or two from the top, each tier of bags being about 23 bags high with approximately 400 bags on the ceiling (floor) of the hold. It is said that some little air space was provided at places between the bags, and on the sides about a foot of space was left; but on arrival these were apparently negligible in amount, possibly due to the settlement and spreading of the bags. Similarly in lower hold No. 6, there was stowed 10,963 bags of fish meal, consisting of five different lots, and occupying nearly the entire hold. More than fifty per cent. of all this meal was discharged in bad condition.

· In general the same conditions prevailed on the Nichiyo and the Tohsei, with the fish meal stowed in the lower holds. The Nichiyo carried 12,642 bags in the lower hold, of which amount 8,960 bags (about 70%) were damaged; and the Tohsei carried 7,621 bags in No. 1 lower hold of which 4,373 (nearly 60%) were heated and wet on arrival. In these latter ships a network of rice ventilators, arranged some horizontally and some vertically, were inserted, to afford some interior ventilation to parts of the whole mass but the resulting effect was negligible, as even a larger percentage of the meal in the lower holds was damaged than on the Soyo Maru.

The whole testimony was much too voluminous to refer to in detail, but the more important facts established may be summarized as follows:

1. It was well known in the shipping trade that fish (sardine) meal is an oily substance, tending to spontaneous combustion, unless afforded a high degree of ventilation; and therefore it should preferably be stowed between decks where the ventilation is ordinarily greater than in the lower holds of the ship. This is not to say that no fish meal should ever be carried in the lower holds but when so stowed, provision should be made for a greater amount of ventilation than usual for general cargo.

2. All the fish meal in these three ships carried between decks was discharged undamaged with a negligible exception. But more than fifty per cent. of all the fish meal

carried in the lower holds of each of the three ships was discharged in damaged condition.

3. The Soyo Maru carried 22,356 bags of fish meal for Wellman's account. Of this all but about 2,000 bags were carried in lower holds of the ship. ·9,945 bags were discharged in good condition 'but 12,411 bags were discharged in damaged condition. In lower hold No. 1 there were 9,289 bags of which 7,903 were damaged. Lower hold No. 6 carried 12,191 bags of which 4,508 were damaged. In the forecastle and No. 6 between decks of the ship about 2,000 bags carried were. discharged undamaged.

The Nichiyo Maru carried 19,600 bags of which 8,960 were damaged and 10,640 were undamaged; in between decks and the poop deck spaces carried 6,958 bags, none of which were damaged. In lower hold No. 1 were carried 12,642 bags, of which 8,960 were damaged.

The Tohsei Maru carried for Wellman's account 11,205 bags of which 6,832 were discharged undamaged and 4,373 were damaged. 3,584 bags carried between decks were undamaged. From lower hold No. 1 were discharged 3,248 undamaged and 4,-373 damaged bags.

4. The libelant alleges that the ships were unseaworthy, but this is not put forward as an independent ground of liability but only as related to the insufficiency of ventilation for the particular cargo for the voyages. I find that the fixed or permanent ventilators for the ships were adequate for general cargo and rated good even for perishable cargo. In this sense I find the ships were seaworthy for the voyage.

5. The libelant also alleges in all three cases mismanagement on the voyage of the hatch coverings especially the betweendecks hatch covers of the lower holds. The testimony shows some variation in this respect with regard to the several ships. The matter is evidently one that must be left largely to the discretion of the master of the ship having regard to the exigencies of the weather on the voyage. I find no actual negligence on the part of the ships in this respect. However, it should be said that the testimony on behalf of the ships fails to· affirmatively show inspection of the condition of the fish meal in the lower holds from time to time on the voyage. Apparently the heating was not discovered until the arrival of the ships in New York. It is probable that the heating had begun long before this and it would seem that prior inspection of

the cargo should have brought the trouble to light, in which event further precautions could have been taken with regard to ventilation or if necessary possibly a part of the cargoes discharged at some intermediate port to prevent further damage.

6. The testimony does not affirmatively show any fixed and established custom or usage to justify the method of stowage and the limited amount of ventilation afforded to fish meal on such long voyages as occurred in these cases. Prior experience of the officers of the crew of these three ships was, with one or two exceptions, limited to voyages of much shorter duration in the carriage of fish meal. There was testimony from some of the officers of the crews to the general effect that the stowage was as customary and usual. But it was not specific with respect to such long voyages as were here involved nor with respect to the quantity of fish meal stowed in such masses in the lower holds.

■ 7. I find the cause of the damage was the stowage of very large masses of fish meal in the lower holds with entirely inadequate provision for the ventilation thereof. In the cases of the Soyo Maru the only provision for ventilation was to leave an air space of about a foot on the four sides of the tiers of bags with some effort to provide small air spaces between some of the bags which, as already stated, was largely nullified by the settlement of the bags during the voyage. In the Nichiyo Maru and the Tohsei a net-work of rice ventilators was used to afford some interior ventilation to parts of the whole mass. And on the Tohsei wind sails were used on deck at times to increase the flow of air through ventilators to the lower holds. But these extra precautions for ventilation in the cases of the Nichiyo and the Tohsei were entirely inadequate to provide sufficient ventilation for the mass of bags stowed in the lower holds.

8. The respondents contend that all facts considered, the damage to the fish meal should be attributed to its inherent nature and characteristics or, in other words, that the fish meal that was damaged was not in condition proper for shipment by reason of its being too green, that is, too recently manufactured. This contention is based not on any direct evidence with respect to particular lots of fish meal (with one possible exception) but only on an inference sought to be deduced largely from the consideration that despite the precautions

taken for ventilation, meal on all three ships was damaged. The inference is not supported by the testimony. There is no evidence to show that all fish meal of a particular make became damaged in carriage irrespective of where it was stowed; nor is there evidence to show that some lots of fish meal carried undamaged irrespective of place of stowage. The true inference would seem to be that it was the place and conditions of stowage rather than the character of the particular lots of meal that was responsible for the damage. All the fish meal was apparently in good condition when shipped. It had been inspected by the regular Port Inspector. I find no explanation from the evidence of the cause of damage other than inadequate ventilation.

■ 9. On consideration of these facts and the testimony as a whole, bearing in mind the knowledge in the trade as to the characteristics of fish meal and having in view the long voyage contemplated, the stowage of the meal in the lower holds in such large masses without making adequate provision for ventilation, constituted in my opinion a failure to exercise reasonable skill and care in stowage and management of the cargo which in law constituted negligence on the part of the ships causing the loss.

■ The respondents properly say that they can be held liable only on a showing of failure to exercise reasonable skill and care in the stowage and carriage of the fish meal, and that the damage from heating being within the exception of the bill of lading, the burden of proof is on the libelant to show negligence on the part of the respondent ships. Spang, Chalfant & Co. v. Dimon S. S. Corporation (The Pacific Fir), 57 F.(2d) 965, 1932 A.M.C. 738 (C.C. A. 2); The Hog Island (D.C.) 43 F.(2d) 243, 1930 A.M.C. 703, affirmed 48 F.(2d) 101, 1931 A.M.C. 739 (C.C.A.2); The Tergestea (D.C.) 54 F.(2d) 809, 1931 A. M.C. 1904; The Cherca (D.C.) 52 F.(2d) 646, 1931 A.M.C. 1399; The Mussel Crag (D.C.) 125 F. 786, 789; Monnier v. United States (D.C.) 16 F.(2d) 812, affirmed (C. C.A.) 16 F.(2d) 815; Rhodes v. United States (D.C.) 8 F.Supp. 124; The Skipsea, 1924 A.M.C. 1210; The Nagisan Maru, 1936 A.M.C. 283. The libelant does not contest the point as to where lies the burden of proof of negligence in this case but is content to assume it on the facts. Compare The Schnell v. Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373. The question is not of controlling importance here

because on the testimony as a whole I have reached the conclusion that the loss was due to negligent stowage. As to respondents' contention that the stowage was usual and customary, it may be observed that custom will not excuse negligence. United States v. M. Levy's Sons (The Lake Fontenac), 288 F. 544 (C.C.A.5); The Charles Rohde, 8 F.(2d) 506 (D.C.Md.); The Richelieu, 48 F.(2d) 497, 501, 502 (C.C.A.4). In addition, it must be said, as already indicated, that I do not find the respondents have satisfactorily shown the existence of the custom set up.

Respondents also contend that at the time of the voyages here involved it was not generally known to the shipping trade, and indeed is not now known, just what amount of ventilation is necessary for the safe carriage of fish meal. And from this it is argued that it is not proper to find negligence on their part in the absence of their knowledge. But this contention seems to be answered by what has been quoted from the opinion of the Circuit Court of Appeals for this Circuit in Bank Line, Limited, v. Porter, and what also was said in the factually similar case of Willfaro-Willsolo, supra.

We come now to the determination of the amount of the liability of the respective ships. The proof in the case is not as satisfactory as it might be with regard to either the extent of the damage to the fish meal or the monetary loss occasioned thereby. The separation of the good and bad bags from each of the three ships was left largely to dockmen and stevedores but the number of good and bad bags was counted at the shipside by checkers representing the respective parties whose count agreed in each case. All the damaged fish meal from all three ships was placed in two bins in one of the Standard's warehouses without separation with respect to the damaged fish meal from the several ships. It is contended by the respondents that in the same bins there was also placed all the good fish meal without separation from the bad; and the respondents' surveyors testified that they were so informed by a representative of the Standard Company. This is, however, disputed by the latter, and there is positive testimony that the undamaged fish meal was stored in the original bags in another warehouse. Although the testimony on the point is conflicting, I reach the conclusion that there was a misunderstanding on this point. As the undamaged material had a substantially higher commercial value than the damaged, there was seemingly no motive on the part of the Standard Company to fuse both. There is, of course, no dispute about the fact that a very considerable portion of the fish meal on each of the three ships was damaged by heating. Indeed this was known to the officers of each of the ships who conveyed the information thereof to the ships' agents in Baltimore before arrival. Written notice of the claim of damage was given by Wellman to the ships' agents here immediately after inspection of the cargoes upon arrival. The first ship arrived on June 1, 1934, and the others on June 12th and 13th. It was apparently not until the arrival of the latter ships, with the accumulating claims for damages, that counsel for the ships engaged the services of surveyors. They contend that no reasonable opportunity was afforded them to survey the goods to determine the extent of the loss. In view of the accumulation of the claims and the apparent extent of the damage, it would seem that it would have been much more satisfactory if supervision of the separation had been entrusted to superior executives of the Standard Company and, if the damaged material from the three ships had been kept separate. The lack of so doing is justified, however, by the president of the Standard Company on the ground that it does not take an expert to distinguish between damaged and undamaged fish meal; that determination can readily be made by inspection of each bag by superficial indications of heat, moisture and discoloration; and furthermore, that, that even where only a part of a bag was discolored, the bacterial processes of deterioration are such that no part of the bag could have safely been used or mixed with good material by reason of the danger of infecting the latter; and therefore, as the damaged condition of the meal was for all practical purposes substantially uniform, there was no necessity to keep the respective ship's cargoes separate; and also the dumping and fusing of the material was necessary in order to prevent its firing from spontaneous combustion.

Viewing the testimony as a whole and even recognizing some measure of just complaint on the part of the respondents as to the lack of greater opportunity on their part for inspection and determination of the extent of the damage, I feel obliged to accept the only figures in the case as to the physical extent of the damage, especially as the original separation of the good from the bad meal was checked by representa-

tives of the ships and found in agreement with the figures of the checkers representing the libelant.

Nor is the evidence as to the amount of the pecuniary loss wholly satisfactory. It is clearly proven that fish meal in good condition has a bright yellow or golden color which renders it suitable as an ingredient for feed for poultry and some live stock; and it can also be used as an ingredient of fertilizer which will command a premium price over and above that of ordinary fertilizer. The damage to fish meal by heating and sweating resulted in changing its color from a light golden yellow to a very dark brown and the substance gave indication of being charred or burnt. It is not disputed that on the evidence the result was to render the fish meal entirely unusable as a feed and also unavailable for use in mixing of the grade of fertilizer which sells at a premium. It further appears, however, that the chemical analysis of the damaged meal showed a nitrogeneous content which was substantially the same as that of the undamaged meal and its commercial value for ordinary fertilizers was therefore not lessened.

The Standard Company contends that as the damaged meal was usable only for ordinary fertilizers on the basis of its chemical content, it was worth no more in its damaged condition than other substituted materials which it could buy with the same chemical properties as ingredients for ordinary fertilizers. It has submitted evidence to the effect that some six months prior to the receipt of these shipments it bought damaged fish scrap or fish meal for similar purposes and also, nearer the time of the shipments, bought "tankage," a materially different product, for fertilizer use, at the price of $21.71 per ton which it compares with the purchase price of the good fish meal at $33.00 per ton. The libelant, therefore, claims the difference between these two prices as the measure of damages for the number of tons of damaged fish meal from each of the shipments. The tonnage for the ships respectively, estimating 20 bags to the ton, was, for the Soyo Maru, 620.55 tons; for the Nichiyo Maru, 448 tons, and for the Tohsei Maru, 218.65 tons. On this basis the damage would amount for the respective ships to the following sums: The Soyo Maru, $6,934.66; the Nichiyo Maru, $5,416.32, and the Tohsei Maru, $2,565.64.

Respondents have submitted no testimony as to the proper measure of damages. There is, however, other testimony offered by the libelant that some of the damaged fish meal on one of the ships for another consignee and rejected by the latter, not having been paid for, was, after some effort, sold by Mr. Wellman to a third party at $28.00 per ton. The libelant contends that the quantity was small and sold only after extended efforts and not, therefore, a fair measure of the market price for the much larger quantity of damaged fish meal bought by him at $33.00 per ton. However, without pursuing the consideration of the testimony in further detail, I reach the conclusion that this sale represents more fairly, under all the circumstances of the case, the value of the damaged fish meal than the price paid for substitutes therefor, such as tankage, by the Standard Company. I therefore find that the monetary damage should be calculated on the basis of $5.00 per ton for the damaged material on each of the ships which produces in the case of the Soyo Maru, $3,102.75; for the Nichiyo Maru, $2,240, and for the Tohsei Maru, $1,093.25. As interest in admiralty in such cases is discretionary, I think no interest should be allowed in these cases.

Counsel may submit decrees in the respective cases in accordance herewith. If the findings of fact and conclusions of law herein contained should not be regarded as sufficiently specific to comply with Admiralty Rule 46½, I shall be glad to consider more specific findings when submitted by counsel.