## THE M. V. SILVERSANDAL.

District Court, S. D. New York.
Dec. 2, 1938.

Hill, Rivkins & Middleton, Robert E. Hill, and Eugene P. McCue, all of New York City, for libellant.

Lord, Day & Lord and Ernest D. North, all of New York City (Henry C. Blackiston, Jr., Sydney S. Coggan, and Wilbur E. Dow, Jr., all of New York City, of counsel), for claimant-respondent, Silver Line, Ltd.

CLANCY, District Judge.

This is a libel for alleged damage to 269 bales of European Estate ribbed smoked sheet rubber, shipped on the Silversandal from Soerabaja, Java, where it was taken aboard on May 8, 1937, to New York, where the vessel arrived on July 12, 1937.

Two hundred and twenty-four bales of the libellant's rubber were loaded into the No. 2 lower hold at Soerabaja as part of a cargo of 6,576 bales stowed in this hold. In the forward part the rubber was stowed on top of bales of hemp covered with a single, solid layer of dunnage, the rubber being stowed to a height of six or seven tiers. In the after part of No. 2 hold were five or six rows of cased rubber stowed clear athwartships which acted as a bulkhead or stiffener. The bales of rubber were placed hard against and aft these cases where the tank top had been double dunnaged, and the limber boards at the turn of the bilge were squared off with bundles of rattans carried as broken stowage. These rattans of one-half to one inch diameter and of irregular lengths, approximating twenty feet, were packed in eight inch bundles which were stowed to a height of five or six feet and at the top extended about five feet from the limber boards. On top of the rattans thwartship dunnage was laid, then a layer of fore and aft dunnage and upon this the rubber was tiered to a height of 8 or 9 bales. In the center where rubber was stowed from the tank top, the stow ranged in height from eleven to thirteen tiers.

Forty-five of the bales were stowed in the two forward compartments of No. 4 lower hold as part of a stow of 5,734 bales. These compartments were about eighteen feet deep, twenty-seven feet wide and thirty-five feet long and were squared off with dunnage. They were stowed to a height of some nine tiers. All the bales of rubber in both hatches were placed flat side down and no other cargo was stowed on top of them.

The libellant complains that this stowage was bad but we do not agree. We think dunnage laid between the tiers of rubber would certainly indent the bales. The first officer thought so and we agree with his judgment and think that the nature of rubber confirms it. Again, it would be well nigh impossible to so dunnage bales received on board in unlike sizes and irregular shapes; their heights varied, the mate said, as much as six or seven inches. Dunnage under these circumstances would subject some of the bales to even greater pressures than the manner of stow adopted by the Silversandal put upon them. It is true that most of the contortion and indentation complained of was found in the bales that were in tiers higher than the rattan stow. But, the original height of the piled rattans was fixed as that of a man which is a variable on which no computation can fairly be made of the extent if any of their subsequent depression. To find whether they sank and where and to what extent and why would be to hazard a guess for how closely the rattans lay when stowed, how truly aligned and where they sank, if they did—whether at the middle of the pile or towards the keel or towards the spar ceiling, would all be involved in a determination that the mechanical forces so thought to be set in motion caused the condition of the output bales and there is no evidence in the case to enlighten us on any of these features of the rattan stow.

It was admitted in the pleadings and during the trial that the rubber was received on board the Silversandal in actual good order and condition. When discharged, all but twenty of the libellant's bales were crushed and misshapen and some of them were indented; how many, was not made clear.

Rubber is a universally known and used commodity. Its outstanding characteristics are resiliency, flexibility and extensibility and these characteristics are known and recognized by its every user. The rubber in the bales in suit is manufactured in strips about six feet long which are doubled into lengths, not at all exactly, to make a bale about twenty-five inches long. These doubled lengths are superimposed flatly on each other in a pile and several of these piles, together weighing two hundred and fifty pounds, are subjected to pressure and bound with wire hoops and then wrapped in burlap. It will appear from this that the doubled ends of the strips will make a thicker and more resilient end than the free end of the strip and if one end of the bale was made of more doubled than of free ends that fact alone would make that end more resilient than the opposite end. The metal loops or binders are wholly concealed by the burlap wrapper and there is no evidence in the case that anybody on the Silversandal knew or had reason to know that there was a metal binder. The number of hoops differs on different bales and no standard of number or position on the bale was proved or even hinted. The average bale is twenty-five inches high and long and twenty-one inches wide. It was a number of such bales that were presented to the Silversandal for shipment and surely, considering its structure and content, no cargo with the possible exception of metal ingots could better promise to sustain the roughest treatment.

The respondent admits the bales were altered in shape and flattened and that loss was sustained by the libellant. This loss is met in the rejection of tender without an allowance by the consignee's vendee and, maybe, such a tender was insufficient under their contract of sale, but we are not deciding their rights. The elements of the loss are not altogether clear to the Court. The testimony of the inspectors indicates that acceptance or non-acceptance of bales of rubber in a flattened and misshapen condition such as those of the libellant is largely arbitrary. The representative of the purchaser looks casually upon an entire shipment and either accepts it with an allowance or rejects it. It appears that the same purchaser would accept a shipment of its own in a condition which would call for rejection had it been tendered by another. It further appears that a shipment is viewed as a whole and whereas a lot containing a number of somewhat compressed bales might on one occasion be accepted, a lot containing a greater percentage of bales compressed, but to a less degree, would on another occasion be rejected. This Court is not convinced that the mere acceptance or rejection by an inspector for a purchaser for reasons not apparent—indeed

not clearly explained in a reasonably long trial—is sufficient ground for determining the existence of any damage whatever of a character properly attributable to the ship or her owner. The experts at the trial did not agree among themselves on the reasons for their disapproval. We think possibly that an inspector either consciously or unconsciously considers the adherence of burlap lint to the rubber in determining whether certain bales should be accepted, and that an expert may determine whether or not it is adhering merely by looking at a bale without closer examination. But damage by reason of the adherence of the burlap lint is not part of libellant's claim. It was expressly disclaimed by its attorney during the trial. We comment upon it only in an endeavor to understand the inspector's acceptance or rejection after a casual observation.

In view of the fact that the baled rubber is a raw product and is cut up and mangled as the initial step in its treatment for any use, we are unable to understand why any bale's shape or lack of shape can per se be an element of damage. Explanations given are that the misshapen bale cannot be fed into the mechanical slicer but it turned out as would be expected that the mechanical slicer was adjustable. Possibly a mangled bale requires special handling and perhaps hand cutting. It was testified that bales of rubber coming from different plantations have different sizes. In fact, it appears that the bales in issue here were received by the respondent in "all sizes and shapes", some having straight sides and some a bulge, and this is entirely reasonable in view of the manner of packing the bales which has no uniform plan and gives to the bale a general shape formed under pressure, the easing of which subjects the bale to irregular and uncoordinated internal stresses and strains. It is to meet these conditions of the material that manufacturers have cutters which are adjustable to fit these various sizes and shapes. The extremes to which and the facility with which these cutters may be adjusted is not before the Court but in the absence of more convincing testimony we find that a change in shape or flattening of bales of rubber which have no uniform size or shape cannot be an element of damage fairly attributable to the ship except perhaps in extreme cases. Should we follow libellant's theory that difference in size or shape affects the capacity of slicing machines it could follow that bales, compressed into uniformity of line, might sell at a premium on the market.

The embedding of the metal bands in the rubber was the real burden of the surveyors' complaint against the libellant's shipment. This is said to incur additional labor charges in the handling of each bale for it requires extra time and effort to remove a deeply embedded band. It does not appear that all bales of rubber have the same number of metal bands or that bands are always in the same position on every bale. We do find, however, that the embedding of bands may require an expenditure for labor to release them which though almost insignificant is still something to be considered and may become fairly substantial when a large number of bales is involved. It would appear that this embedding of bands is a natural result flowing from the manner of packing rubber and the characteristics of the material. The bales are formed and banded under pressure. The inevitable result is that the rubber expanding when the pressure is released surrounds and embeds the non-tensile metal band. Then too, the rubber, being elastic and forming a "live" stow, each bale would suffer some working from the ship's sway and pitch without the superposition of any weight. This would also effectuate embedding of the bands.

The fact is that the Silversandal was employed to carry rubber of a certain quality in bales of two hundred fifty pounds each and that it delivered bales of rubber that had not suffered any deterioration in quality nor any diminution in weight. The vessel did not contract to deliver bales that would gratify the fancy or flatter the business acumen of a consignee's vendee and we see no reason to hold it liable for any result which may have been objectionable to a rubber expert on some special ground but is not clear to the Court and would not have been apparent to a seaman. A ship's captain is not expected to be familiar with the minutiae of rubber trading and in justice can only be called on to meet a situation that is overtly presented to him. It was obvious requirements of the cargo or those that should have been recognized that were enforced in Doherr v. Houston, D. C., 123 F. 334;

The Jeanie, 9 Cir., 236 F. 463; Wellman v. Toyo K. K. K., D. C., 14 F.Supp. 727, affirmed, 4 Cir., 89 F.2d 539; The Will-faro and The Willsolo, D. C., 9 F.2d 940; The Polaria, D. C., 25 F. 735; Southern Pacific Co. v. Walker-Smith, Tex.Civ.App., 257 S.W. 347; Northwestern Marble & Tile Co. v. Williams, 128 Minn. 514, 151 N.W. 419, L.R.A.1915D, 1077.

The damage complained of here, if it be recognizable at all, arises from the inherent qualities of the goods and the ship is not liable for that. 46 U.S.C.A. § 1304(2) (m). Whatever embedding of the hoops results from the resiliency of the rubber when the pressure under which the hoops are set is released may be due to insufficiency of packing and that is not a liability of the ship. 46 U.S.C.A. § 1304(2) (n). The libellant has failed to prove that any negligence of the vessel caused or contributed to the loss.

The libellant presses upon the Court the City of Khios, D. C., 16 F.Supp. 923, 1936 A.M.C. 1291, as a precedent that sustains his claim. But, the only analogous feature we find in that case is that the vessel there too carried some baled rubber. We whole-heartedly accept the Court's decision in the Khios Case. The rubber in that case was cased as well as baled and the condition of the outturned cargo, as described in the opinion, suggests that regardless of the character of the merchandise or of its packing it could be caused by nothing else than outrageous negligence in stowing it. The carrier there attempted to bring itself within the excepted cause of peril of the sea and the Court held that the evidence did not sustain that claim. The insufficiency of packing which the ship set up as a defense was the failure to size the contents of the bale which the Court held the evidence did not sustain and further that the ruin of the cased rubber that accompanied the baled rubber showed that the manner of packing the bales did not explain the havoc wrought in the hold. On the matter of stowage, the Court held that the outright contradictions of the ship's witnesses impaired their testimony to such an extent that the shocking condition of the cargo as outturned overbore it in every respect.

We cannot perceive the pertinence of that case to the one we have decided.

Libel dismissed.