**THE NIEL MAERSK.**

District Court, S. D. New York.
Aug. 13, 1936.

Hill, Rivkins & Middleton, of New York City (Robert E. Hill, of New York City, of counsel), for libelants.

Haight, Griffin, Deming & Gardner, of New York City (Herbert M. Statt, of New York City, of counsel), for claimant and respondents.

GODDARD, District Judge.

This libel was filed by the copartnership of Bradley & Baker, and a copartnership doing business under the name of the Fox Company against m/s Niel Maersk D/S A/S Svenborg Og A/S D/S of 1912, claimant and respondents to recover the total sum of $2,600 for damage to shipments totalling 6,000 bags of Japanese fish meal carried on the S/S Niel Maersk from Kobe, Japan, under bills of lading dated February 8, 1935 consigned to New York, Boston, Philadelphia, and Baltimore. The shipments arrived at New York on March 17 and after calling at Boston and Philadelphia, finished her discharging at Baltimore, arriving there on March 31.

The libel alleges that the fish meal was delivered to the vessel by Mitsubishi Shoji Kaisha, Limited (as shipper), in good order and condition, and that when the deliveries of the shipments were made to the consignees at the various destinations the fish meal was "not in like good order and condition as when received, but on the contrary the bags were torn and otherwise damaged and the meal caked, lumpy and otherwise damaged and depreciated in value." The answer to the libel denies the receipt of the merchandise otherwise than in apparent outward good order and condition. It is also alleged and it is stipulated that the shipment was subject to the British Carriage of Goods by Sea Act of 1924 (14 and 15 George V, ch. 22). Ex-

ceptions contained in that act and exceptions included in the bills of lading are also set forth in the answer.

## The Facts.

There were 10,000 bags of fish meal loaded on the Niel Maersk 6,000 of which are involved here. All were shipped by Mitsubishi Shoji Kaisha, Limited, who were the sellers and shippers of the cargo at Kone. The several libelants purchased the various shipments of fish meal, paid for it and received from Mitsubishi Shoji Kaisha, Limited, clean bills of lading.

The Niel Maersk is a Danish motor ship built according to Lloyd's Register of Shipping in 1931. She is a "flush-deck" vessel approximately 437 feet long over all, 54 feet 6 inches beam; she has no deck between the main deck, which forms the top of the lower hold, and the weather deck which forms the top of the shelter deck compartment. The motor room extends athwartship from the port and starboard sides of the vessel underneath the forward part of No. 4 and the after part of No. 3 shelter deck. The motor room casing, as it extends up through the shelter deck, is set in from the sides of the vessel a distance of 10½ feet forming alley ways of that width between the sides of the vessel and the casing, and it opens out with skylights onto the boat deck. At the forward end of the motor room are two forward deep tanks each with a capacity of 465 tons which contained cocoanut oil. At the after end of the motor casing are also two after deep tanks with a capacity of 234 tons each also filled with cocoanut oil. These tanks are directly under part of the space where the fish meal was stowed. The spaces are separated by steel bulkheads extending from the ship's side to the motor casing. The alleyway in No. 3 shelter deck extends aft to a bulkhead for a distance of about 14 feet. In No. 4 shelter deck space the alleyway is approximately 30 feet long. General cargo occupied the space on the shelter deck not taken up by the fish meal. The sides of the engine room casing starting from the tweendeck sloped inboard at an upward angle. Next to the casing were laid one-inch boards and against these boards were stowed bags of fish meal. Permanent cargo battens separated the fish meal from the sides of the vessel. On the iron deck were placed two layers of dunnage consisting of one-inch boards; the lower layer running athwartships and the upper one fore and aft. The lower layer of boards was about two feet apart and in the upper there were spaces between the boards of two to four inches.

The 10,000 bags of fish meal were stowed in the after parts of No. 3 and No. 4 shelter decks. Five thousand bags were stowed in the No. 4 shelter deck and were separated from the motor room casing by some ten feet in which the fresh water tanks are located, and below was stowed Philippine raw sugar and general cargo; the remaining 5,000 bags were in No. 3 shelter deck, part of them directly over the deep tank carrying cocoanut oil. Underneath the weather deck are the supporting beams; these beams are 6 inches in depth and from the under side of them to the iron floor of the shelter deck is 8 feet 4 inches. The bags of fish meal are about 9 inches thick 15 inches wide, 30 inches long, and weigh 100 pounds each. During the voyage they settle down to a thickness of 7½ to 8 inches. The bags were stowed ten tiers high, so that after allowing 2 inches for dunnage when first stowed, there was a space of 8 inches between the bags and the bottom of the beams, and during the voyage as the bags settled this space increased by about a foot.

## Ventilation.

According to the plan of the Niel Maersk, at the forward end of the No. 3 shelter deck space directly abaft the officers quarters and bridge, there are two ventilators, one on the port side and one on the starboard side. These are "telescoped" with 22-inch pipes leading to the shelter deck and 16½-inch pipes leading to the lower hold; they are 12 feet high and have 3-foot cowls. Aft of these are four ventilators serving the deep tanks but which do not open into the shelter deck. Directly aft of the deep tank ventilators there are a row of six vents running thwartships forward of the boat deck. Four of these serve the engine room and two ventilate the No. 3 shelter deck; these two being located some 14 feet forward of the after bulkhead. In No. 4 shelter deck there are two hammer type ventilators having a cowl open at both ends located directly abaft the boat deck superstructure. These were telescoped and were similar in size and construction to those in the No. 3 shelter deck space. There were also two "telescope" ventilators serving the lower hold and the shelter deck space No. 4 and they were located aft

of the No. 4 hatch. There were no bulkheads between No. 2 and No. 3 shelter decks so that cargo in No. 3 received some ventilation from the ventilators in No. 2 space, although the alleyways under the bridge were filled with baled matting and did not afford much room for ventilation. In the bulkheads between No. 1 and No. 2 and between No. 3 and No. 4 shelter decks there were openings 5 feet wide which were closed by planks inserted across them in channel irons at the sides but which left a space of some 2 inches at the top. In addition to the four vents mentioned, there were four large ventilators leading from the boat deck to the motor room and one to the shaft tunnel. The skylights on top of the motor casing also serve when open as ventilators for the motor room.

"Rice" or box ventilators were used in the cargo of fish meal. These are wooden boxes 5 inches square formed of two solid sides held together with slats on the opposite sides. They are frequently used in carrying cargoes of rice. These "rice" ventilators were placed in the following manner: Commencing from the bottom three tiers of bags were laid on the floor of dunnage; then a series of these ventilators extending fore and aft; on top of them a series of three tiers of bags, followed by another set of ventilators; then four tiers of bags. "Rice" ventilators were placed athwartship between every six or seven rows of bags. All told there were six rows of ventilators athwartships. There were no perpendicular "rice" ventilators to connect with the horizontal ones.

The Niel Maersk left the port of loading in Japan on February 9 and arrived in New York March 17. During the voyage the No. 2 hatch was not opened. The No. 3 hatch remained closed except on the following days: February 12 from 7 a. m. to 8:30 a. m., February 15, February 16, February 17, February 18, February 21 during forenoon, February 27, March 1, four days between March 4 and March 8, and on March 9 for discharge of cargo at Baboa. The No. 4 hatch was opened for approximately the same periods and on February 28, when it was opened for discharge of cargo at Los Angeles. None of the hatches were open at night. The reasons given by Chief Officer Schaeffer for not having the hatches opened on other days was that it was inadvisable to do so because of rain or seas coming on board. But it appears from the log of the Niel Maersk, also from his testimony, that on February 13, February 15, February 17, February 18, March 2, and March 4, the hatches were not opened, although the weather was fair and the wind and sea calm, the wind not exceeding force 3 on the Beaufort scale. No satisfactory explanation was given for not opening the hatches at all at night during the voyage. "Opening a hatch" consisted of taking out one plank along each side of the hatch, leaving an opening about 20 inches wide and the length of the hatch. The corners of the tarpaulins over the hatch were lifted up. The ventilators were covered with canvas covers on February 19 to February 26 inclusive because of rain. On the two hammer-shaped ventilators for No. 3 shelter deck only one end—the one away from the weather—was covered.

The cocoanut oil in the deep tanks was loaded into the deep tanks at Manila and its temperature at the time of loading was approximately 80°, but for the purpose of making it flow easily in discharging it is usually heated to a temperature of about 110°. This heating was commenced on March 11 and continued until March 18, when it was discharged at New York at a temperature between 105 and 110 degrees.

When the fish meal was received on board the Niel Maersk it was "flexible and soft" and "in good order apparently." Upon delivery many of the bags of fish meal were "caked" and "lumpy" and in somewhat less merchantable condition, which libelants claim is due to the negligence of the respondents in stowing it in a space that was overheated and where the ventilation was inadequate and faulty.

The respondents deny these charges and assert that the place and character of the stowage was good and that sufficient ventilation was provided; also that if the fish meal was in a different condition when discharged from that in which it was received on board the Niel Maersk, it was due to the inherent vice of the fish meal, for which they are not responsible.

The weight of the evidence is that the fish meal was not in as good condition when discharged as when received on board the Niel Maersk, and the question is whether the carrier is excused because of the exceptions in the contract of carriage, or whether the damage was the result of its negligence in providing faulty stowage with poor ventilation, and thus making it liable.

■ Fish meal is an oily substance and is liable to heat and spoil, particularly on

a long voyage, and requires ample ventilation. Bank Line, Ltd., v. Porter, 25 F.(2d) 843 (C.C.A.4). It is the duty of ship owners to use due care to ascertain the characteristics of goods offered for shipment and to exercise due care in handling them. The Willfaro (The Willsolo) (D.C.) 9 F.(2d) 940, affirmed Williams S. S. Co. v. Wilbur (C.C.A.) 9 F.(2d) 622; Bank Line v. Porter (The Poleric), 25 F.(2d) 843 (C.C.A. 4). In the case at bar the Niel Maersk's officers admitted that they knew that fish meal was a delicate cargo to carry requiring extraordinary ventilation, and that it should be stowed away from heat and moisture.

[redacted] The exception in the contract of carriage relieving the carrier from the "heating and sweating" of the fish meal does not excuse it from liability for such damage if the "heating and sweating" resulted from the carrier's negligent stowage and failure to provide proper ventilation. Schnell et al. v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373.

[redacted] In the present instance I think the evidence shows that the heating and sweating which caused the damage was the result of the carrier's failure to provide the ample ventilation and character of stowage which fish meal requires on a voyage of this duration. Although carried in the shelter decks, it was solidly stowed with but little or no space for air circulation between the bags and the sides of the ship or bulkheads and above the mass of bags there was only a space varying between 8 and 20 inches. It is true that horizontal "rice" ventilators were provided, but as the bags were packed close to the sides of the shelter deck there was not a free circulation of air through them. While the weather or sea conditions did not permit the hatches to remain open all during the voyage, they were never open at night and there were several periods of two days each or more when they were not open, although conditions permitted. See The Vallescura (D.C.) 43 F.(2d) 247, reversed on grounds Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373. Moreover, while the heat which came from the heating of the cocoanut oil in the deep tanks to 110 degrees may not cause damage if there is an abundance of ventilation, the heat was turned on March 11 and continued until the Niel Maersk discharged her cargo in New York on March 18, and during all this time the hatches were closed. Under such conditions I am convinced, after hearing the testimony of those accustomed to handling fish meal, that the additional heat which came from the cocoanut oil did contribute to the overheating of this lot of fish meal stowed above it, some directly overhead.

In The Nichiyo Maru (D.C.) 14 F.Supp. 727, and in The Willfaro, supra, the details as to stowage and ventilation differ but both cases hold the vessel liable for insufficient ventilation and improper stowage of fish meal. These cases have recognized that fish meal may be and is carried safely if properly stowed and ventilated. It is also plain that it is a commodity that requires more ventilation than general cargo.

The libelants may have a decree with a reference to ascertain the amount of damage.