**AMERICAN TOBACCO CO. et al. v. THE KATINGO HADJIPATERA et al. (and sixteen other cases).**

United States District Court
S. D. New York.
Nov. 23, 1948.

See also 40 F.Supp. 546.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and John W. R. Zisgen, both of New York City, of counsel), for libelants.

Burlingham, Veeder, Clark & Hupper, of New York City (Roscoe H. Hupper, George F. Tinker, Ray Rood Allen, and Burton H. White, all of New York City, of counsel), for respondent Hellenic Lines, Ltd.

Reid, Cunningham & Freehill, of New York City (James E. Freehill, and Walter T. Hughes, Jr., both of New York City, of counsel), for Hadjipateras Bros., etc.

RIFKIND, District Judge.

This proceeding is a consolidation of libels and petitions involving cargo damage which occurred during the voyage of the Greek S. S. Katingo Hadjipatera from Greece to the United States.

On the morning of October 28, 1940, the S. S. Katingo Hadjipatera lay alongside a wharf at Piraeus, Greece, laden with a general cargo, chiefly tobacco, ready to sail via Gibraltar to Newport News and Norfolk, U. S. A. She had been chartered on October 7, 1940, for that voyage, from her owners, J. C., N. C., and A. C. Hadjipateras, by Hellenic Lines, Ltd., had loaded cargo at Volos and Cavalla, Greece, Izmir, Turkey and other ports and had returned to Piraeus where she completed her loading.

At noon on October 28, 1940, upon requesting sailing clearance, her captain was ordered by the Greek Naval Staff not to sail, war having broken out between Italy and Greece. Since the war patently prevented the accomplishment of the scheduled voyage through the Mediterranean to Gibaltar, the charterer, the ship-owners, and many of the shippers entered into negotiations looking to a voyage by the only alternative route, via the Suez Canal and around the Cape of Good Hope. On November 2, 1940, at Piraeus, over the captain's protests, the charterer ordered the receipt and stowage of 80 additional tons of tobacco, consisting of 1552 bales. On November 3, 1940, The Greek Naval Staff ordered the ship to remove to an anchorage in the Gulf of Elefsis where she would be less exposed to damage from enemy air attack. On November 10th, 1940, immediately after a dispute between the charterer and the principal shippers over additional freight had been arbitrated by the Greek Ministry of Marine, the ship was ordered to and did sail in convoy to Suez, subject to the direction of the British Admiralty, which continued to direct her voyage.

Late in January, 1941, insects were observed coming out of all holds through ventilators and hatch openings, and this phenomenon continued until the ship arrived at Pernambuco, Brazil, on February 4, 1941, at which time heat was also observed ascending from No. 3 hold to a considerably greater extent than from the other holds. On February 17, 1941, smoke ascended through the ventilators of No. 3 hold, fire was diagnosed, and an attempt made to smother it by closing off all ventilation and employing patent fire extinguishers. Upon the failure of these methods, the No. 3 tweendeck hatch was opened, a space cleared through the tweendeck stow, and water pumped through the hatchway into No. 3 hold. The fire was extinguished. The tweendeck was then substantially re-

stowed, leaving a passage for access to the hold below. During this same period, increased heat was felt from No. 1 hold, but no smoke or fire resulted. A sinking of the stow in No. 4 hold permitted access for inspection by the captain, who found nothing wrong.

The ship arrived at Newport News on February 26, 1941, and fire again broke out in No. 3 hold, but was quickly extinguished.

Upon outturn of the cargo, damage was revealed as follows:

Forepeak: Of 100 cases of cheese, one was missing and the remainder stained.

No. 1 hold: Of five lots of tobacco stowed over undamaged licorice root, all lots were damaged to varying extents by heating.

No. 2 tweendeck: A lot of Saloniki tobacco was slightly damaged by sweat. A lot of Volos tobacco was ⅓ damaged by heating.

No. 2 hold: Izmir, Saloniki and Cavalla tobacco suffered minor sweat damage only.

Crossbunker: Olive oil drums were damaged, leaking and missing. Cases of cheese were badly damaged by loss of butter fat, and miscellaneous cargo stowed beneath the cheese was damaged by butter fat drippings, and by spoilage.

No. 3 tweendeck: All the tobacco was damaged by heat, fire and water.

No. 3 hold: The bottom stow of licorice root was water-damaged, and the remaining stow of tobacco damaged by heat, fire and water.

No. 4 hold: One lot of Volos tobacco was ⅓ damaged by heat, and the remainder of the stow, all tobacco, very slightly sweat damaged.

Poop: Olive oil stowed on top was damaged by leakage, and currants stowed below were sugary from heat.

Deck cargo: Barrels of olives in brine were badly damaged by brine leakage through warped and shrivelled staves, and olives were lost from broken barrels.

The cargo owners promptly instituted proceedings against the ship, her owners, and her charterer. They attributed the damage to the ship's unseaworthiness with respect to stowage and ventilation of car-

go and to lack of due diligence in care of cargo en route. Several of them also claimed breach of contract and deviation. Respondents denied these allegations, pleaded due diligence, claimed that the harm was generally caused by the unavoidable climatic conditions encountered on the long tropical voyage, that the heat and fire damage to tobacco was caused by the inherent vice of two particular lots of tobacco, that of the Brown and Williamson Tobacco Corporation shipped from Cavalla and that of The American Tobacco Company shipped from Volos, and that with respect to the cargo damaged by fire, they were relieved of liability by the Fire Statute. The shipowners petitioned for exoneration from or limitation of liability, and sued for contributions in general average. They and the charterer sued each other for indemnification should they be found liable to the cargo owners. A belated claim by charterer for demurrage has not been pursued. All libels and claims are consolidated in the limitation proceeding.

The multiplicity and varied nature of the claims here asserted makes it advisable to deal first with the principal allegations of fault, to fix the liability for such faults as are found, and then to deal with the miscellaneous claims.

The seaworthiness of the vessel.

There is no question but that the vessel before stowage was in all respects seaworthy, properly manned and equipped and cargoworthy for the purpose for which she was chartered, the carriage of general cargo to the United States via Gibraltar. She was rated 100A1 by Lloyds, fully manned, her officers licensed and experienced, her equipment proper and in accordance with the law of her flag. Like very many other vessels, some of which carried tobacco, she had but two ventilators per hold. This suffices. The Hog Island, D.C.E.D.N.Y.1930, 43 F.2d 243, affirmed 2 Cir., 1930, 48 F.2d 101. Libellants do not seriously maintain that her structural ventilation was inadequate safely to carry any tobacco. Their allegation of improper structural ventilation for the quantity of cargo stowed is no more than an inversion of the real complaint—that too much cargo

was stowed to permit proper ventilation with the facilities available.

Care of cargo en route.

■ There is no claim that the captain undertook any affirmative action which was improper. The uncontradicted evidence proves that the cargo was properly cared for and ventilated by trimming ventilators and removing hatchboards whenever the weather permitted. Any delays during the course of the voyage which resulted in the prolongation of the period during which the cargo was confined were due solely to the exigencies of war. That windsails either could or should have been rigged over the hatches to increase the circulation of air, as libellants contend, or that such a device was customarily employed, was not proved. Nor was it shown that due diligence required the captain to discharge cargo at Pernambuco or Santa Lucia, tropical ports, to permit inspection of the stow. It was not even shown that physical facilities for such action were available. The deck cargo was well tended and wetted down until the bursting of some barrels made continued hosing inadvisable. Due diligence in cargo care en route was exercised.

Stowage.

Libellants' chief complaint is that their cargo was so stowed as to render the ventilating facilities ineffectual and to prevent the dissipation of heat. Since each cargo space was separately ventilated, the stowage of each will be separately considered.

■ Forepeak.—Credible testimony showed that this space was, because of the absence of ventilating facilities, an undesirable place to store so perishable a commodity as cheese, and that it was not customary to stow cheese there.

■ No. 1 hold.—As in the other holds containing tobacco, a block stowage system was here employed. The expert testimony disclosed this to be quite customary and certainly not unusual. As in the other holds, there was in No. 1 hold a permanent fore and aft bulkhead separating the hold into port and starboard halves except in the square of the hatch. No. 1 hold was 58' 11" long, 40' wide, and 27½' deep (mean). Licorice root was stowed to an

average height of 8' in the bottom of the hold, on top of which tobacco was stowed to an average height of about 16½', leaving an average space of 2' between the stow and the deck-beams above. There was a space of 6' between the forward bulkhead and the beginning of the stow, free of cargo except for a few bales of tobacco which may have tumbled down. The stow was elsewhere separated from the ship's sides and bulkheads by 10" frames and battens, the combined breadth of which totaled one foot. Where a bulkhead lacked stiffeners, it was separated from the stow by dunnage. As in the other holds, dunnage and matting were employed in the customary and proper manner to protect the baled cargo. The weight of credible expert testimony is persuasive that the stowage of No. 1 hold was customary and proper, and not excessive with regard to the mass of the stow, especially since the mass was broken into halves for much of the length of the hold by the longitudinal bulkhead, which in this respect served the purpose of a longitudinal channel through the stow, a channel which libellants contended, but did not establish, to be customary. Although horizontal rice ventilators, so called, were not employed in the stow, not only was their use not shown to be customary, but in fact their use was discontinued by other carriers because of shippers' complaints that they misshaped the bales of tobacco.

No. 2 and 4 holds.—Only minor sweat damage was found upon outturn from these holds, yet they were stowed in the same fashion as No. 1 hold, as libellants admit. In neither hold was there one quarter as much free space forward of the stow as in No. 1 hold.

No. 3 hold.—Stowage here was not dissimilar to that in the other holds, except that the depth of the tobacco stow was several feet less than in No. 1 hold. The hold measured 58' 4" long, 48' 6" wide and 24' 6" deep (mean). Licorice root occupied the lowest 8' of depth. Allowing for the space occupied by dunnage, the tobacco stow could not have exceeded 15 feet in depth. This would not be detrimental even if depth of stow were a significant factor

in causing heating of tobacco, as libellants contend.

◼ No. 3 tweendeck.—This compartment was completely filled with tobacco, and no passage of any kind was left for access to No. 3 hold below, or for the passage of appreciable quantities of air through the tweendeck stow to or from No. 3 hold below. After the ship, according to charterer's managing director, had been fully loaded on October 28, 1940, the charterer, over the captain's protests, ordered the receipt of more tobacco, 136 bales of which were placed in what space remained in No. 3 tweendeck, thereby practically sealing the hold below. It is neither customary nor prudent so to fill a tweendeck as to block ventilation and deny access to the hold below, since it minimizes the good effect upon the hold cargo of opening the tweendeck hatches. To load more cargo into the tweendeck after it became apparent that the voyage to be undertaken would be longer and more arduous than that initially contemplated was highly improper. That was the contemporaneous judgment of the master. That is the verdict of the event.

◼ Lower crossbunker.—Cheese was here stowed above miscellaneous cargo. The evidence is not seriously controverted that the lower crossbunker is not a proper place to stow cheese. To stow it above other cargo subject to damage by the spoilage of the cheese is plainly negligent. The C. Lopez y Lopez, 2 Cir., 1924, 297 F. 457; Lazarus v. Barber, 2 Cir., 1905, 136 F. 534, certiorari denied 1905, 198 U.S. 585, 25 S.Ct. 802, 49 L.Ed. 1174. Absent the cheese, stowage of the miscellaneous cargo in the crossbunker would not have been per se improper.

◼ Poop.—The stowage of olive oil and currants in this compartment was not improper. The currants were damaged by heat, to which no fault of stowage appears to have contributed.

Deck cargo.—This cargo, barrels of olives in brine, properly secured, was damaged by tropical heat and climatic conditions. That tarpaulins were not used to cover it completely is excused by the impossibility of obtaining a sufficient quantity at the time and place of departure because of the war conditions, and further because it is not shown that such covering was customary for that particular kind of cargo.

Responsibility for stowage.

Improper stowage in the forepeak, lower crossbunker and No. 3 tweendeck being found, it becomes necessary to determine who is responsible therefor.

The charter-party prescribed that the cargo was "to be brought to stowed and taken from ship's holds at charterer's own risk and expense". The standard printed clause requiring the master to employ the charterer's stevedores at so much per ton was completed to read "free of charge", and the clause requiring captain to supply men to operate the winches was deleted. Charterer's Bills of Lading were to be used, signed in accordance with mate's receipts. In fact the charterer, through its managing director, handled all transactions with the shippers, signed and issued its Bills of Lading, sent its agent aboard to accompany the ship to loading ports and direct stowage, and was fully informed thereof by him. The charterer, over the master's protests, ordered the loading of the additional tobacco at Piraeus on November 2, 1940. It is indisputable that the charterer was directly responsible for stowage of the entire vessel, including No. 3 hold and tweendeck, the forepeak, and the lower crossbunker. With regard to the last, charterer contends that the cheese which was there found spoiled was shifted by the crew from the upper to the lower crossbunker en route. But the cheese was found in the lower crossbunker, on outturn, beneath other cargo which concededly the charterer had stowed there, and the charterer's own final stowage plan shows the cheese stowed in the lower crossbunker. Doubtful testimony by deposition that some cargo, possibly cheese, was shifted from tweendeck to crossbunker en route is insufficiently persuasive.

◼ Since the charterer undertook and directed the stowage with and by its own employees, issued the Bills of Lading and was bound in contract to the shippers, the charterer is liable for any damage resulting from faulty stowage; The Poznan, D.C.

S.D.N.Y.1921, 276 F. 418. The ship, too, is liable, for the charter-party cannot destroy the shipper's maritime lien against her; Pioneer Import Corp. v. The Lafcomo, 2 Cir., 1943, 138 F.2d 907, certiorari denied Black Diamond Lines v. Pioneer Import Corp., 1944, 321 U.S. 766, 64 S.Ct. 523, 88 L.Ed. 1063; cf. The Esrom, 2 Cir., 1941, 272 F. 266, certiorari denied 1921, 257 U.S. 634, 42 S.Ct. 47, 66 L.Ed. 408. The liability of the shipowners, over and above that of the ship, need not be fixed, because the shipowners are entitled to limitation of liability.

 Under the limitation statute, 46 U.S.C.A. § 183, the fault of the master is not attributed to the owner; The Colima, D.C.S.D.N.Y.1897, 82 F. 665. Other than the master, no person of authority connected with the owners had personal knowledge of the details of the stow. The owners neither knew, nor had reason to know, of it. Although the burden of proving that they had no privity with or knowledge of the cause of damage is upon them, In re Reichert Towing Line, 2 Cir., 1918, 251 F. 214, certiorari denied 1918, 248 U.S. 565, 39 S.Ct. 9, 63 L.Ed. 424, they have satisfied it. Liability.

 It is sufficiently clear that the stowing of the cheese in the forepeak, where it could not obtain sufficient ventilation, was a competent producing cause of its damage by heat. Stowage of cheese in the lower crossbunker similarly caused its damage, and damage from butterfat drippings and odor to the cargo stowed below this cheese is self-evidently due to the improper stowing of cheese above it. The libellant owners of the forepeak cheese, the crossbunker cheese, and the miscellaneous cargo in the crossbunker damaged by the exudation of butterfat are therefore entitled to recover from the charterer, who did the stowage, and the ship.

 Before recovery is allowed or denied for damage to No. 3 tweendeck and hold cargo, the cause of that damage must be ascertained. It is not seriously disputed that the fire originated in heating of tobacco stowed in the lower center of the hold, where was stowed Brown and Williamson Cavalla tobacco, all of which outturned damage. This lot was stowed in such fashion that a "tongue" of bales, one bale wide and six or seven bales deep, ran thwartships between other lots of tobaccos, and self heating was evident in the "tongue", but not in the adjoining bales. In No. 1 hold the heating of the tobacco centered in the lower level of the stow where also was located Brown and Williamson Cavalla tobacco. Volos tobacco self-heated wherever stowed, whether tweendeck or below. Although other shippers' lots of Cavalla stowed in No. 4 hold outturned undamaged by heat, it is to be noted that they were packed in bales less than two-thirds the size of those in holds No. 1 and No. 3. Other than Volos and Cavalla, no tobaccos self-heated, no matter where stowed. It must be inferred that the Cavalla and Volos lots were, at the very least, more susceptible to heating than all the other tobacco. Since it has already been found that the over-stowage of No. 3 tweendeck materially reduced the ventilation of No. 3 hold, the conclusion is warranted that a combination of improper stowage and susceptibility to heating of the Cavalla tobacco caused the fire in No. 3 hold.

 Ordinarily a shipper need prove only that his goods were loaded in good condition and outturned damaged, in order to recover; The Guanancita, D.C.S.D.Fla. 1947, 69 F.Supp. 928; The Ciano, D.C. E.D.Pa.1946, 69 F.Supp. 35. The burden then lies with the carrier to exculpate itself by proving (a) that the harm resulted from an "excepted cause", a cause for which it is statutorily not liable, or (b) that it exercised due diligence to avoid and prevent the harm; 46 U.S.C.A. § 1304, The Schickshinny, D.C.S.D.Ga.1942, 45 F.Supp. 813. Since improper No. 3 tweendeck stowage causally contributed to the harm, the defense of due diligence is not maintainable. But two "excepted causes" are here asserted, fire and inherent vice.

 Under both the Fire Statute and the Carriage of Goods by Sea Act the shipowner and carrier are not liable for fire damage, unless caused by owner's design or neglect, 46 U.S.C.A. § 182, or carrier's actual fault or privity, 46 U.S.C.A.

§ 1304. It is clear on the evidence that the shipowners took no personal part in the stowage, were unfamiliar with the details of the stow, and neither ordered the stowage of the additional cargo at Piraeus, some of which went into No. 3 tweendeck, nor were aware of its placement there. That the master may have been personally at fault in this respect does not impose liability on the shipowners, for his neglect is not their neglect within the Fire Statute; See Earle & Stoddart, Inc., v. Ellerman's Wilson Line, Ltd., 1932, 287 U.S. 420, 425, 53 S.Ct. 200, 77 L.Ed. 403. The shipowners not being liable, the ship is not liable; Consumers Import Co. v. Kabushiki Kaisha Kawasaki Zosenjo (The Venice Maru), 1943, 320 U.S. 249, 64 S.Ct. 15, 88 L.Ed. 30. It is urged that because some damage occurred by heating before the fire broke out, then, if the ship cannot prove what damage was solely caused by fire, she is liable for all damage. This argument would nullify the Fire Statute in many, if not all, cases of spontaneous combustion— an absurd result; cf. Consumers Import Co. v. Kawasaki Kisen Kabushiki Kaisha (The Venice Maru), 2 Cir., 1943, 133 F.2d 781, affirmed 1943, 320 U.S. 249, 64 S.Ct. 15, 88 L.Ed. 30, where the same argument could have been made on the facts.

Although negligence by its agent on board who supervised stowage would not be imputable to the charterer, this agent being too subordinate in the chain of command, cf. Consumers Import Co. v. Kawasaki Kisen Kabushiki Kaisha (The Venice Maru), supra, 133 F.2d at page 785, neglect by the charterer's managing director is imputable to the charterer. This managing director actually insisted, over the master's protests, that more cargo be loaded after, by his own admission, he considered the vessel fully loaded and when he knew that a much longer and more arduous voyage than that for which she had been loaded would have to be undertaken. He knew where it was being stowed. Whether or not he actually foresaw the danger of fire from insufficient ventilation, the danger of heating was foreseeable, the danger of fire therefrom is always to be anticipated, and his failure to act to prevent heating constituted a cause

of the fire. See Consumers Import Co. v. Kawasaki Kisen Kabushiki Kaisha (The Venice Maru), supra, 133 F.2d at page 785. The charterer is, therefore, not relieved by the Fire Statute from liability for cargo damage in No. 3 tweendeck and hold caused by heat, fire, and water used to extinguish the fire.

The defense of "inherent vice" is strenuously urged to apply to the Brown and Williamson Cavalla lot and the American Tobacco Company Volos lot stowed in No. 3 hold and No. 3 tweendeck, respectively. Whenever the defense of inherent vice is raised, and it appears that the damage arose internally, it self-evidently calls into question the good condition of the goods upon shipment. "Apparent good condition" is normally conceded by the Bill of Lading; but this does not refer to such unobservable conditions as are encompassed by the phrase "inherent vice". The question thus arises whether the burden of proof of good condition is on the shipper to disprove inherent vice, or the burden of proof of inherent vice is on the carrier.

The Supreme Court has said that the carrier by sea who delivers in bad condition cargo that he had received in good condition has the burden of establishing every exception to his general liability; Schnell v. The Vallescura, 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373. The weight of this burden was moderated when certiorari was denied, 1937, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582, to review The Niel Maersk, 2 Cir., 1937, 91 F.2d 932, in which it was held that the shipper must affirmatively establish the good condition at time of shipment of goods damaged by heating, where the carrier claimed the cause to have been inherent vice. This would suggest that whenever cargo damage could have been caused by internal defects, the shipper must disprove such defects in order to recover even if the carrier's failure to exercise due diligence in stowing or caring for the cargo may have caused or contributed to the damage; The Niel Maersk, supra. Contra: The Nichiyo Maru, 4 Cir., 1937, 89 F.2d 539. (In other cases in which both the carrier's fault and an excepted cause produced the dam-

age, the carrier is liable for all the damage unless it can establish what proportion was due to the excepted cause; Schnell v. The Vallescura, supra.) Although the ultimate burden of proof differs as between a common carrier and a mere bailee, the initial duty of explaining the cause of damage is normally placed upon both bailee and carrier because, being in possession of the goods, they have the best and frequently the only knowledge of what actually took place. Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89. But this rationale is hardly applicable to inherent vice or its obverse, the good condition of the goods at the time of shipment. On the contrary, it is the shipper who has access to that information, and therefore should be compelled to tender it.

 There must, of course, be some practical limits to the shipper's obligation. In The Niel Maersk, supra, where spontaneous heating of fish meal was involved, the shipper offered no admissible evidence of good condition. Here there is voluminous testimony by tobacco men on the scene as to inspection and proper preparation of most of the tobacco shipped including the Cavalla belonging to Brown and Williamson and the Volos lots. It appears that Greek tobacco prepared for shipment is handled similarly by all shippers to the United States, and that the tobacco here involved was handled in the customary manner. There was no proof offered, however, of the moisture content of any shipment, and the moisture content of tobacco plays a significant role in the self-heating or fermentation of baled tobacco. In this respect the hazards of shipment resemble those of sardine meal, the spoilage of which has often been the subject of litigation. Compare The Niel Maersk, D.C.S.D. N.Y.1936, 18 F.Supp. 824, reversed 2 Cir., 1937, 91 F.2d 932, certiorari denied 1937, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582, with The Nichiyo Maru, D.C.D.Md.1936, 14 F.Supp. 727, affirmed 4 Cir., 1937, 89 F.2d 539; The Willfaro, D.C.N.D.Cal.1925, 9 F.2d 940. But it is not necessary to hold that the absence of proof of moisture content constitutes a fatal defect despite other evidence of good condition, for the other evidence in this case, showing customary inspection, packing and handling, relates to a short, cool voyage via Gibraltar, not to a long, hot voyage via Suez. It could not relate to the latter not only because such a voyage was not contemplated when the tobacco was prepared for shipment, but also because none concerned had had any experience in the inspection or preparation of tobacco for such a voyage. Proof of good condition for the voyage undertaken fails even apart from absence of proof of moisture content, and, on the authority of The Niel Maersk, supra, recovery for damage to the Brown and Williamson Cavalla and the American Tobacco Company Volos lots must be denied. While the other tobacco libellants are equally unable to establish internal good condition they, too, having no proof of moisture content or customary preparation and inspection for a Suez voyage, they are not barred thereby because it affirmatively appears from the evidence (indeed is urged by respondents) that their tobacco was not damaged by internal heating, but rather by the heat and fire originating in the Cavalla lots. The Niel Maersk doctrine is, therefore, inapplicable.

Cargo care having been proper, and stowage, with the exception of forepeak, lower crossbunker and No. 3 tweendeck and hold having been proper, damage to cargo stowed elsewhere must be attributed to the extended duration and climatic conditions of the arduous voyage, and not to any fault of charterer or ship.

American Tobacco Company claim for breach of contract.

 The American Tobacco Company claims a specific agreement whereby the charterer agreed to stow tweendecks its tobacco loaded at İzmir and Volos, that the charterer failed in great part so to do and stowed in the holds instead, that this constituted a deviation, and that in consequence the charterer became absolutely liable as an insurer for any damage to this cargo not stowed tweendecks. cf. The St. Johns, N.F., 1923, 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201. The charterer sets out the Bills of Lading covering these shipments, which do not specify tween-

deck stowage, and urges that all prior understandings are merged in the Bills of Lading. Such merger does take place unless the goods are beyond recall when the Bill of Lading is issued and accepted. Cf. Burns v. Burns, 2 Cir., 1904, 131 F. 238; see Transmarine Corp. v. Charles H. Levitt & Co., 2 Cir., 1928, 25 F.2d 275, 277. The Bills of Lading here involved were issued and accepted at Izmir and Volos by the local branches of the American Tobacco Company pursuant to an agreement between American Tobacco Company and charterer and bear the dates October 16, 1940 and October 24, 1940, respectively. The ship did not sail from Izmir until October 19, 1940 and from Volos until October 25, 1940. There is no proof that at the times the respective Bills of Lading were issued and accepted the goods were beyond recall, or even that any protest was made respecting place of stowage. The court is not at liberty, therefore, to enforce any alleged prior agreement. This makes it unnecessary to decide whether proof of a causal relation between deviation and damage, and of initial good condition, are conditions precedent to recovery when breach of a specific stowage agreement is established; cf. Niles-Bement-Pond Co. v. Dampkiesaktieselskabet Balto (The Balto), 2 Cir., 1922, 282 F. 235.

Elias Germack claim for breach of contract.

■ Ship and charterer are liable as for deviation to Elias Germack for damage to his 400 barrel shipment of olives stowed on deck. His Bill of Lading did not specify on deck shipment except to reserve the right to stow on deck " * * * at shipper's risk and danger all such goods as from their nature or dimensions the Master shall not consider proper or safe to be stowed below deck". There is no proof that this shipment was stowed on deck for that reason. Since the damage here resulted from the weather hazards of deck carriage, and might not have occurred if the olives had been stowed below, it must be found that the unauthorized stowage on deck caused the harm. The St. Johns, N.F., 1923, 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201; The Sarnia, 2 Cir., 1921, 278 F. 459, certiorari denied 1922, 258 U.S. 625,

42 S.Ct. 382, 66 L.Ed. 797; cf. The Peter Helms, D.C.W.D.Wash. 1938, 24 F.Supp. 461, (right to carry on deck unqualifiedly reserved).

Sweat damage.

■ Sweat, moisture condensation in a ship's hold, is, in relatively minor amounts, classed as a peril of the sea, although due diligence to avoid it must be established to relieve of liability. The Asturias, 2 Cir., 1942, 126 F.2d 999. In this case sweat damage was relatively slight and appeared more or less indiscriminately in the various ship's compartments. The evidence establishes that the ship was equipped with the customary drains and the cargo covered in the usual manner to avoid its contamination by moisture from the condensation which occurs on the ship's sides during climatic variations. Ventilation for the purpose of minimizing sweat is not shown to have been faulty, nor was there failure to ventilate the cargo en route whenever weather permitted. There was testimony that some sweat damage is inevitable on a voyage such as was here undertaken. What sweat damage here occurred was not greater than this.

Shipowner's claim over against charterer.

■ It is indisputable that the charterer not only undertook the burden of stowage under the charter party, but actually performed that duty throughout. While the master retained an absolute right to direct stowage, for which he is, vis-a-vis third parties, always ultimately responsible, it is equitable that as between the charterer and the ship, the charterer should bear the loss. Pioneer Import Corp. v. The Lafcomo, 2 Cir., 1943, 138 F.2d 907, certiorari denied Black Diamond Lines v. Pioneer Import Corp., 1944, 321 U.S. 766, 64 S.Ct. 523, 88 L.Ed. 1063; The Thomas P. Beal, 3 Cir., 1926, 11 F.2d 49; see Oxford Paper Co. v. The Nidarholm, 1931, 282 U.S. 681, 685, 686, 51 S.Ct. 266, 75 L.Ed. 614. The Cesser clause in the charter-party does not relieve the charterer from this liability. Crossman v. Burrill, 1900, 179 U.S. 100, 108, 21 S.Ct. 38, 45 L.Ed. 106.

Claims of cargo owners not consenting to the Suez voyage.

A carrier which voluntarily and unjustifiably deviates from its agreed or usual course becomes an insurer. The Willdomino v. Citro Chemical Co., 1927, 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491. But it is confusing in this case to speak of deviation since it is obvious that the change in route was necessitated by the exigencies of war. Had it occurred en route, no liability would attach. It did not, however, occur en route. At the time of abandonment of the Gibraltar voyage, the charterer had the theoretical alternatives of cancelling the voyage and off-loading or arranging new terms with the shippers. The evidence is overwhelming that the charterer made every effort to reach the various shippers to secure their approval for the new route and, in its own interest, their approval of increased freight. There is no evidence that any shipper refused to give consent, though it is not clear that all in fact authorized the new route. Furthermore, the charterer in the exercise of prudence might well have found it to be dangerous to unload cargo and leave it on the wharf at Piraeus. As to cargo loaded elsewhere, charterer would have been at fault if it had dumped the cargo at Piraeus, nor was it feasible to return each shipment to its port of origin. Recovery grounded on deviation must therefore be denied those shippers, if any there were, who neither consented to nor ratified the new route. General average.

The essence of a general average contribution is that " * * * extraordinary sacrifices made and expenses incurred for the common benefit and safety are to be borne proportionately by all who are interested". The Jason, 1912, 225 U.S. 32, 57, 32 S.Ct. 560, 56 L.Ed. 969. Such a situation is here presented with respect to the extinguishing of the fire in No. 3 hold. Although both ship and shipowners have been held to be free of liability for fire damage and the charterer alone has been found liable therefor, the fact remains that the master also bore responsibility for the improper stowage of No. 3 tweendeck which was causally connected with the fire. Nevertheless the shipowners are entitled to contribution in general average because the Bills of Lading provided that " * * * the general average, never can be contested upon the ground * * * of fault of Captain, pilot, crew, or other servants of the ship or her Owners". Due diligence having been exercised by the shipowners to make the ship seaworthy, and general average contribution for damage caused by the master's fault having been contracted for, the cargo interests are liable to contribute in general average for the ship's damage and expenses occasioned by the fire. The Jason, 1912, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969.

To summarize the findings herein: The S.S. Katingo Hadjipatera was seaworthy, cargoworthy, properly manned, equipped and managed, and properly stowed in all respects except—cheese was improperly stowed in the forepeak and above other cargo in the crossbunker; the Elias Germack shipment was stowed on deck without authorization, and the No. 3 tweendeck was so improperly stowed as to inhibit ventilation. The charterer was primarily, the ship secondarily responsible for stowage. Improper or unauthorized stowage was in each instance a competent producing cause of the harm. For the spoilage of cheese in forepeak, damage to cheese and to miscellaneous cargo damaged by cheese spoilage in the crossbunker, damage to Elias Germack's olive shipment stowed on deck, and short delivery of any shipments, charterer and ship are liable. Shipowners are entitled to limitation of liability and recoupment against charterer for the ship's liability. Charterer alone is liable for fire damage in No. 3 hold and tweendeck. The ship's prayer for general average contribution is granted. The American Tobacco Company and the Brown and Williamson Tobacco Corporation can not recover for damage to their respective Volos and Cavalla tobacco shipments stowed in No. 3 hold.

Proctors may submit proposed findings of fact and conclusions of law in accordance with opinion. Assessment of damages will be referred to a commissioner.