AMERICAN TOBACCO COMPANY, R. J. Reynolds Tobacco Company, and Liggett & Myers Tobacco Company, Libellants-Appellants,

v.

Basil GOULANDRIS, Nicholas Goulandris, and Leonidas Goulandris, doing business as "Goulandris Brothers," Respondents-Appellees.

BANK OF GREECE, Libellant-Appellant,

v.

Basil GOULANDRIS, Nicholas Goulandris, and Leonidas Goulandris, doing business as "Goulandris Brothers," Respondents-Appellees.

No. 292, Docket 26012.

United States Court of Appeals Second Circuit.

Argued May 2, 1960.

Decided July 19, 1960.

Henry N. Longley, New York City (John W. R. Zisgen, Owen C. Torrey, Jr. and Bigham, Englar, Jones & Houston, New York City, on the brief), for libellants-appellants.

James E. Freehill, New York City (Hill, Betts & Nash, New York City, on the brief), for respondents-appellees.

Before LUMBARD, Chief Judge, MEDINA, Circuit Judge, and JAMESON, District Judge.*

MEDINA, Circuit Judge.

In this consolidated cause the owners of a large quantity of Turkish and Greek tobacco outturned in a damaged condition at destination, after carriage on board the S.S. "Ioannis P. Goulandris," appeal from a decree of Chief Judge Ryan dismissing all the claims and exonerating the owners of the vessel from any and all liability for such damage. Chief Judge Ryan's opinion is reported at 173 F.Supp. 140.

On October 26, 1940 the "Ioannis P. Goulandris" arrived at Piraeus, Greece, having on board various shipments of tobacco received and stowed at Izmir, Cavalla and Salonika. Everything was in readiness for an anticipated voyage by way of Gibraltar to Newport News, Norfolk and New York. Italy attacked Greece on October 28, 1940, and as the vessel was of Greek registry, she was immediately requisitioned by the Greek Government and sent on a military mission to the Corinth Canal. Upon her return, and in obedience to directions from the Greek Government, she loaded the balance of her Piraeus cargo, and sailed from Piraeus on November 10, 1940 in convoy to Port Said and thereafter followed the orders of the British Admiralty on the long, hot voyage of some 13,-

* Sitting by designation.

000 miles through the Suez Canal and around the Cape of Good Hope to her ports of destination.

All the tobacco involved on this appeal was of the 1939 crop and had been purchased from Turkish and Greek planters between January and May, 1940. As the tobacco had been grown on hundreds of small farms, each lot had characteristics different from any of the other lots due to the soil, rainfall and temperature of the locations where it was grown; and the growing season for the 1939 crop had been unusually rainy. The evidence discloses the elaborate procedures customarily adopted to prepare the green tobacco for baling, storage and later manipulation and rebaling. That tobacco had a tendency to heat was well known by all concerned; and the process that culminates in spontaneous ignition starts with a bacteriological development of long duration, during which the heat is evolved slowly, followed by a chemical decomposition, during which the temperature rises rapidly.

As might well have been anticipated, parts of the cargo of tobacco did overheat and the extent of the damage and its location in particular parts of the stow we think clearly demonstrate that the fact that many bales were outturned sound and others so badly overheated as to be of little or no value was due to the different moisture content of the various bales. In No. 3 hold a fire broke out on March 28, 1941, and further damage resulted from the water poured into that hold to extinguish the fire.

The principal contentions of the cargo owners are: that the tobacco was improperly stowed and ventilated, that it was not properly cared for during the voyage; that the damage was due to delays caused by lack of due diligence to remove defects in the condenser and in the tailshaft and in the quality of coal used, all of which are said to have rendered the vessel unseaworthy; that all the cargo was in good order and proper condition for carriage at the time of stowage aboard the vessel; and that the trial judge improperly applied the rule governing burden of proof in cases of inherent vice and also improperly applied the Fire Statute with respect to the damage to the cargo in hold No. 3.

We have examined this massive record with care and are unable to discover any basis for setting aside any of the findings as clearly erroneous. There is little to add to the thorough and detailed exposition in Chief Judge Ryan's excellent opinion of the issues in all their ramifications. The few alleged unwarranted assumptions of fact in the opinion and similar matters relied upon by appellants are of no consequence whatever when considered against the extensive background of testimonial and documentary evidence, especially that of the experts whose testimony the trial judge credited.

Two critical facts lie at the foundation of the decree appealed from. When Italy declared war on Greece the whole picture immediately changed. Not only did the shipowners lose all control of their vessel but they were not even able to communicate with her master because she was sailing under confidential orders and in convoy. Delays of substantial duration were inevitable due to war conditions, and such delays eventuated. The only coal available for bunkering was of the poorest quality, and the preoccupation of shipyards with the demands of the British naval forces greatly increased the time within which necessary repairs could be made. While the methods of manipulation, storage, preparation for shipment and examination before shipment employed by the shippers of the tobacco on the vessel were safe and proper for the transportation of the tobacco to the United States by way of Gibraltar, they were not safe and proper for the long voyage around the Cape of Good Hope, which involved crossing the Equator twice. Accordingly, Chief Judge Ryan made the following findings [173 F.Supp. 140, 157]:

"All of the cargo * * * was properly stowed in accordance with the custom and usage in the trade for a voyage to the United States

via Gibraltar. In respect to the care and custody of the cargo and the prosecution of the voyage actually made, the Master, under all the circumstances, exercised all possible due diligence, sound discretion and prudent judgment, and took action he deemed most expedient and in the best interest of all concerned.

"The fermentation and self-heating and consequent damage to the tobacco stowed in Nos. 1, 2 and 3 lower holds and No. 3 'tweendeck, including the spontaneous combustion and fire in said latter hold and 'tweendeck, occurred because the tobacco in certain bales at time of shipment was more susceptible to self-heating than other bales and because of the length and climatic conditions of the voyage undertaken via Suez and the Cape of Good Hope following the outbreak of war between Italy and Greece. The damage was not caused by any fault of the vessel, her owners, officers or crew."

As there was no convincing proof of the moisture content of the various shipments of tobacco, due in all probability to the fact that no such tests were necessary for the short, cool voyage via Gibraltar, and as self-heating of tobacco is an inherent vice, a basic contention of appellants is that error was committed when the trial judge held that as the tobacco was shown to have been damaged by heating of internal origin "the ultimate burden of establishing that the tobacco cargo was free of inherent vice" rested on appellants. This holding is clearly in accord with the rule of this Circuit. E.g., The Niel Maersk, 2 Cir., 1937, 91 F.2d 932, certiorari denied 1937, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582; American Tobacco Company v. The Katingo Hadjipatera, D.C.S.D.N.Y.1948,

81 F.Supp. 438, 446–447, modified on other grounds, 2 Cir., 1951, 194 F.2d 449, certiorari denied, 1952, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370; Hecht, Levis & Kahn, Inc. v. The S.S. President Buchanan, 2 Cir., 1956, 236 F. 2d 627.[1]

In The Niel Maersk, supra [91 F.2d 933], a number of bags of sardine meal, which according to the bills of lading "were shipped on board in apparent good order and condition," were, when received, found to be damaged. The District Court, S.D.N.Y.1936, 18 F.Supp. 824, found that the stowage and ventilation were not adequate and therefore held for the libellants. On appeal, 1937, 91 F. 2d 932, we accepted the trial court's findings of fact as to inadequate stowage and ventilation but reversed its decision because there was no competent proof in the record as to the moisture or oil content of the meal. We held that "[t]he shippers had the burden of establishing that their merchandise was in actual good order and condition at the time of shipment. [Citing cases.] This burden was not sustained, and libellants accordingly must fail in their effort to recover damages against the carrier."

Appellants attempt to distinguish the cases cited *supra* by submitting that the principle of these cases "does not require proof that cargo is in good condition to be carried on a voyage of unexpectable length with unexpectable vicissitudes." They contend that at most they were only obligated to prove their tobacco was in condition for carriage on a voyage, the length of which was anticipated on the day the vessel set sail. It is hard to understand, however, how any specific length of time could reasonably be anticipated by intelligent men under the conditions surrounding the outbreak of war. In any event, the ship was found not to be responsible for the delays. In-

1. The Fourth Circuit takes the opposite position. For a discussion of the different positions in a factual context similar to the instant one see Brown & Williamson Tobacco Corp. v. The S.S. Anghyra, D.C.E.D.Va., 1957, 157 F.Supp. 737, 748–749, reversed on other grounds sub nom. Hellenic Lines Ltd. v. Brown & Williamson Tobacco Corp., 4 Cir., 1960, 277 F.2d 9.

deed, it is clear that the length of the voyage was the direct result of the war. Under these conditions we perceive no reason to shift from the shipper his burden of proving that the cargo was free of inherent vice. If the damage in fact resulted from the condition of the tobacco when shipped, the shipper must bear the loss. It seems reasonable to place the burden of proof on the shipper once the damage is shown to have been of internal origin for he is clearly the one who has access to the information on this question. American Tobacco Company v. The Katingo Hadjipatera, D.C. S.D.N.Y.1948, 81 F.Supp. 438, 447 modified on other grounds, 2 Cir., 1951, 194 F.2d 449, certiorari denied, 1952, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370. As the burden of proof is placed on the shipper because of his greater knowledge of the condition of the tobacco when shipped, the unexpected length of the voyage in no way affects the policy basis of this rule.

As Chief Judge Ryan noted, 173 F. Supp. 140, 177, his findings that all of the tobacco was properly stowed and cared for during its voyage on a seaworthy vessel and that the heating damage to the cargo in the No. 1 and No. 2 holds was due to "inherent vice" should dispose of the claims for cargo stowed in the No. 3 hold which was damaged by fire. Chief Judge Ryan went on to discuss the claims for cargo stowed in the No. 3 hold, presumably because this question would arise on appeal, were this Court to refuse to accept the findings mentioned above. As we have adopted these findings and the finding (173 F. Supp. 140, 178) that the damage in the No. 3 hold resulted from inherent vice also, we refrain from any discussion of Chief Judge Ryan's interpretation of the Fire Statute, 46 U.S.C.A. § 182, and the fire exemption of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(2) (b).[2]

Affirmed.

2. Compare American Tobacco Company v. The Katingo Hadjipatera, D.C.S.D.N.Y., 1948, 81 F.Supp. 438, modified on other grounds, 2 Cir., 1951, 194 F.2d 449, with

Cargo Carriers v. Brown S.S. Co., D.C. W.D.N.Y., 1950, 95 F.Supp. 288, and The Buckeye State, D.C.W.D.N.Y., 1941, 39 F.Supp 344, at page 347.